STATE OF NEBRASKA, APPELLEE, V. JAY E. BRUNA, APPELLANT.
686 N.W.2d 590

Filed September 7, 2004.    No. A-03-544.

Lawrence G. Whelan for appellant.

Jon Bruning, Attorney General, and Kevin J. Slimp for appellee.

IRWIN, Chief Judge, and SIEVERS and CASSEL, Judges.

PER CURIAM.

## I. INTRODUCTION

Pursuant to a jury verdict, Jay E. Bruna was convicted in the district court for Sarpy County of first degree sexual assault on a child and sentenced to 15 to 50 years in prison. Bruna appeals, alleging that the trial court committed numerous prejudicial errors and that Bruna's trial counsel was ineffective in several respects. Although we conclude that these matters lack merit regarding the pretrial motions and trial proceedings, we find merit in the error assigned regarding the trial judge's sentencing comments.

## II. BACKGROUND

The information asserted one charge of first degree sexual assault on a child, a Class II felony in violation of Neb. Rev. Stat. § 28-319(1)(c) (Reissue 1995). It specifically alleged that between December 1, 2001, and May 20, 2002, Bruna, a person 19 years of age or older, subjected A.T., a person younger than 16 years of age, to sexual penetration. Bruna and the State each filed several motions before and during trial. We summarize the relevant motions and rulings in the analysis section of this opinion.

The court conducted a trial on March 3 to 7, 2003. Because the evidence regarding the elements of first degree sexual assault is relevant only to Bruna's motions for directed verdict, we summarize that evidence in the manner most favorable to the State. See *State v. Spurgin*, 261 Neb. 427, 623 N.W.2d 644 (2001).

We first summarize the testimony of A.T., the victim, in detail. A.T. was born on January 27, 1990. During the 2001-02 school year, he was a sixth grader and often rode a schoolbus, driven by Bruna, home from school. A.T. described Bruna as his friend.

A.T. related events showing that Bruna took an unusual interest in A.T.:

During the 2001-02 school year, A.T. played a saxophone in the school band. He took private band lessons from the band teacher. Bruna attended these private lessons and "would just sit

there" during them. Bruna also attended A.T.'s band concerts. Bruna told A.T. and other children that if they practiced their instruments more, they could go to a hockey game. As a result of this incentive, A.T. attended a hockey game with Bruna, other boys, and the father of one of the other boys. Bruna told A.T. that Bruna played percussion instruments and the guitar. A.T. wanted to learn to play the guitar and asked Bruna to teach him. Bruna replied that he would give A.T. lessons at Bruna's house.

A.T. also played baseball on a team composed entirely of boys. Bruna attended almost all of A.T.'s baseball games, standing behind a dugout. A.T. did not see Bruna speaking to the parents at the games but admitted that it was possible that Bruna did so when A.T. was not watching.

A.T.'s school hosted a grandparents' tea between Thanksgiving and Christmas of 2001. A.T. had no grandparents in the area, and without any request, Bruna offered to attend. A.T. accepted the offer and sat with Bruna at the tea. If A.T. had not brought a guest, the tea's sponsor would have assigned a stranger as A.T.'s guest.

During his sixth grade year, A.T. obtained a haircut at a barbershop in Springfield. A.T. saw Bruna at the barbershop, watching A.T. and taking his picture. Bruna did not tell A.T. why Bruna took the photographs. A.T.'s mother accompanied A.T. to the haircut appointment, but A.T. did not know whether she spoke to Bruna.

On A.T.'s birthday in January 2002, Bruna gave him a greeting card which, although torn into pieces, was received in evidence.

In addition to driving the schoolbus, Bruna worked at a bar in Springfield. Bruna inquired whether A.T. wanted a job mowing the lawn at the bar, but Bruna did not tell A.T. how much Bruna intended to pay for this work.

Bruna told A.T. that he owned several cars, including "a Corvette, a Lincoln, and . . . two or three Broncos," and A.T. asked to see Bruna's cars. Bruna told him that he would bring a picture of a car the next day, but he never did.

A.T. explained the circumstances involving the events on the schoolbus:

During the second half (January to May) of the 2001-02 school year, A.T. rode the bus home two to three afternoons per

week; on the remaining schooldays, his parents, both of whom work, brought him home. At the beginning (September) of that school year, A.T. sat in the back of the bus, but Bruna later made A.T. and one of A.T.'s friends, B.T., sit in the front because, Bruna claimed, the two boys were "acting up." The two boys sat on the front seat across from Bruna. When A.T. rode the bus, Bruna would bring him food. Bruna did not give food to the other children, but he sometimes gave the other children candy. At some point during the school year, B.T. resumed sitting in the back of the bus, but A.T. continued to sit in the front. At times, rather than sitting on the front seat, A.T. would sit on the engine cover between the front seat and the driver's seat. When doing so, he faced Bruna, with his legs on the side of the cover closest to the driver's seat. A.T. sat on the engine cover almost every time he rode the bus between January and May. A.T. did not know how this practice began. While sitting in this location, A.T. assisted Bruna by opening the bus' door, using the control lever in front of the engine cover.

A.T. lived in a house just outside of Springfield's Meadow Oaks subdivision, where the backyard adjoined the premises of B.T.'s residence. Sometimes A.T. would get off the bus at B.T.'s residence, play there, and then walk home through A.T.'s backyard. B.T.'s residence was located on Meadow Ridge Drive, one-half mile from its intersection with Cornish Road.

At a point after Christmas 2001 and also after the hockey game mentioned above, Bruna began stopping the bus on Cornish Road near Meadow Ridge Drive while he and A.T. were alone on the bus. The first time Bruna stopped the bus there, they talked while Bruna sat in the driver's seat and A.T. sat across from him in the front seat. The next time A.T. rode the bus, Bruna did not stop on Cornish Road. On the next occasion when Bruna and A.T. were alone on the bus and Bruna stopped it on Cornish Road, Bruna did so at the same location and told A.T. to go to the back of the bus. A.T. went three-quarters of the way toward the back of the bus and sat on a seat, and Bruna kneeled on one knee in the aisle. Bruna touched A.T.'s penis with Bruna's hands through A.T.'s clothes. Bruna threatened that if A.T. told anyone what had happened, Bruna would hurt him. Bruna then drove away from the area.

Bruna returned to the same area on another occasion when alone with A.T. on A.T.'s way home from school. Bruna again told A.T. to go to the back of the bus. A.T. again went three-quarters of the way to the back of the bus and sat in a seat, and Bruna again kneeled on one knee in the aisle. Bruna told A.T. to pull down his pants, and A.T. complied. Bruna touched A.T.'s penis with Bruna's hands, and, A.T. later testified, "stuff came out of [A.T.'s] penis" and landed on the floor. Bruna again threatened A.T. that if A.T. told anyone, Bruna would hurt him.

On another occasion, Bruna again parked the bus on Cornish Road. Following similar directions by Bruna, A.T. again went to a seat toward the back of the bus, with Bruna kneeling on one knee in the aisle, and at Bruna's direction, A.T. pulled down his pants. Again, Bruna began touching A.T.'s penis with Bruna's hands. Once again, A.T. later related, "stuff came out of [A.T.'s] penis," this time landing on a towel that Bruna had placed on the floor. Bruna then placed his hands on A.T.'s hands and started rubbing Bruna's penis from the outside of Bruna's clothes. Again, Bruna threatened A.T. that Bruna would hurt him if he told anyone. Bruna then took A.T. home.

The next time Bruna parked the bus on Cornish Road, the same general events transpired. Toward the back of the bus, Bruna told A.T. to pull down his pants. After A.T. pulled down his pants, Bruna put A.T.'s penis in Bruna's mouth. Bruna placed a blue paper towel he had brought with him on the floor (such paper towels being kept at the front of the bus). Emissions from A.T.'s penis landed on the towel. Bruna then put Bruna's penis in A.T.'s mouth while they both kneeled in the aisle. Bruna ejaculated into the towel on the floor. Again, Bruna followed the acts with the same threat of harm upon any disclosure. Bruna then drove A.T. home. A.T. believed Bruna "could" hurt him.

After this incident, A.T. asked his parents to drive him home from school, which they generally did thereafter. On a later occasion, however, A.T. again rode the bus. Bruna inquired about his absence. While he was alone with A.T., Bruna again parked the bus on Cornish Road near Meadow Ridge Drive and followed the same general process. At Bruna's direction, A.T. pulled down his pants, and Bruna put A.T.'s penis in Bruna's mouth. "[S]perm" came out of A.T.'s penis and landed on a blue

paper towel (again of the type kept at the front of the bus) on the seat. Bruna then put his penis in A.T.'s mouth while A.T. was in the seat and Bruna, facing the rear of the bus, was in the aisle. Bruna ejaculated onto the towel, which he had moved to the floor. Again, Bruna threatened to hurt A.T. if he told anyone. A.T. was scared of Bruna, as he later testified, and after this incident, he again asked for rides from his parents. For some period of time, they did take A.T. home from school.

Once while A.T. was parked alone with Bruna on the bus, but before Bruna had begun touching him, a man had stopped and asked whether they were having trouble. At that time, A.T. was sitting in the front seat across from Bruna.

On another occasion while A.T. was parked alone with Bruna on Cornish Road, they observed a policeman on a nearby hill. At that point, Bruna "turned around and went back." Bruna told A.T. the next day that the policeman had stopped and talked to Bruna after Bruna had taken A.T. home. He said that the policeman had asked him why he was on Cornish Road and that he had responded that he and A.T. were turning around. After seeing the policeman, Bruna no longer parked the bus on Cornish Road with A.T.

At trial, A.T. explained that he did not tell anyone about what had happened with Bruna on the bus because he thought Bruna would hurt him. On direct examination, A.T. testified that at a sleepover, he told two other boys what had happened with Bruna on the bus. But, on cross-examination, A.T. admitted telling one of the boys that nothing had happened. On redirect examination, A.T. explained that he did so because he thought that if he told the other boy what had happened, the other boy would not like him.

On the last day of school, the school principal asked A.T. what had happened on the bus and A.T. told the principal that nothing had happened. At trial, A.T. explained that he did so because he was embarrassed. After school that day, Bruna approached A.T. at a city park and asked him whether anyone had asked questions. A.T. told Bruna that the principal had asked questions about the bus. Bruna did not respond. The following day, A.T. and his parents met with Deputy Rick Wheeler of the Sarpy County sheriff's office, who was the school resource officer. Wheeler asked A.T. what had happened on the bus. A.T. told

him that nothing had happened, because he was embarrassed to talk about what had happened in front of his parents and because he felt he had done something wrong. Wheeler escorted A.T.'s parents out of the room and returned alone. A.T. then told Wheeler about what had happened on the bus.

We now summarize the testimony of other witnesses:

A.T.'s mother testified that at the meeting with Wheeler, A.T. sat slumped in his chair with his head down. After A.T. had talked to Wheeler alone, he appeared very upset and "looked even worse than before"; he was completely slumped down in his chair with his head down, crying. A.T. would not talk during the 10-minute ride home. When A.T. and his parents arrived at home, A.T. immediately went to his room, shut the door, and got into bed. He did not leave his room any time that evening and did not eat supper. When A.T.'s mother checked on him, he had the covers pulled over his head. A.T.'s mother had never seen A.T. put the covers over his head as part of his normal bedtime routine. During the days that followed, A.T. was very withdrawn, did not want to talk, and would not talk to friends. A day or two after the interview with Wheeler, A.T.'s mother was emptying the wastebasket in A.T.'s bedroom and discovered the previously mentioned torn greeting card. A.T.'s mother taped the card, which had not been in the wastebasket the week before, back together. When she emptied the wastebasket in the bathroom A.T. shared with his brother, A.T.'s mother discovered that A.T. had thrown away three or four of his toothbrushes. A.T.'s withdrawn behavior prompted her to contact a counselor.

Another student who rode the bus testified that he saw A.T. and B.T. receiving Mexican food and submarine sandwiches from Bruna while the other children received only candy. A.T. received such food almost every day. A.T. usually opened the bus' door on the afternoon route from where he sat on top of the engine cover. This student claimed to have seen, toward the end of the 2001-02 school year, A.T. sitting on Bruna's lap in the back of the bus while another busdriver operated the bus.

B.T. testified that he and A.T. were friends and neighbors and that they both rode the bus. B.T.'s residence was the last stop on the afternoon bus route before A.T. got off the bus. B.T. and his sister would get off the bus, leaving A.T. as the only student

remaining. He testified that Bruna prevented A.T. from leaving the bus with B.T. by grabbing A.T.'s arm in horseplay fashion. A.T. would attempt to get off at B.T.'s residence approximately three times a week. After Christmas 2001, B.T. noticed a change in the bus route. After getting off the bus, B.T. could see the bus go down Meadow Ridge Drive and turn onto Cornish Road, sit on Cornish Road for up to 15 minutes, and then return to B.T.'s residence, where A.T. would exit the bus.

B.T.'s mother testified that during the spring of 2002, she observed the bus drop B.T. and his sister off, proceed on Meadow Ridge Drive toward Cornish Road, and then return 10 or 15 minutes later, at which time A.T. would get off the bus.

Bonnie Robinson testified that she had lived at her current house on Meadow Ridge Drive in Springfield for 3 years and in the area for more than 20 years. She described the area as rural, with only a couple of houses other than her own. Robinson testified that Meadow Oaks, a subdivision containing approximately 60 to 80 houses, was located approximately one-half mile from her house and that her house was situated approximately 1,100 feet from the intersection of Meadow Ridge Drive and Cornish Road, a low-traffic intersection controlled by a stop sign on Meadow Ridge Drive. During the 2001-02 school year, Robinson frequently observed a schoolbus pass by her house between 3 and 4:30 p.m., going north on Meadow Ridge Drive. She would see it stop at the stop sign, turn west onto Cornish Road, and then stop and remain parked. Robinson first observed such events during the winter of the 2001-02 school year. From then on, Robinson saw the bus stop in this manner almost daily. On these occasions, the bus would remain parked for 10 to 15 minutes. She would then observe the bus back up and depart from the area, proceeding south on Meadow Ridge Drive. Robinson could not see who was inside the bus. In the more than 20 years she had lived near that intersection, the 2001-02 school year was the only time she observed the schoolbus stop, turn, and then proceed south on Meadow Ridge Drive. One day, Robinson told her friend and neighbor, Shirley Riha, about these observations while, from Robinson's porch, they watched the bus going through the stopping routine.

Riha testified that she lived just east of the Meadow Oaks subdivision. On the day Robinson told her about the bus' stopping routine, Riha saw a man driving the bus and decided to follow it. Riha followed the bus to the top of a hill, and a little boy left the bus at a residence. Another boy was in the yard. Approximately a month later, on April 25, 2002, Riha again observed the bus at Cornish Road and Meadow Ridge Drive as she drove past. At that time, Riha did not see anyone in the driver's seat or in the passenger area. Approximately 10 or 15 minutes later, when Riha was at Robinson's residence, she saw the bus pass by with the door open. She saw a man driving, the same man she had observed driving the bus a month before. Riha then contacted law enforcement regarding her observations.

Sonja Mitchell, a resident of the Meadow Oaks subdivision, testified that she travels on Cornish Road every day on her way to and from work, arriving home between 4 and 4:05 p.m. Mitchell testified that she seldom passes or meets a car on Cornish Road. She observed a bus parked on Cornish Road near Meadow Ridge Drive nearly every day, starting in December 2001 and continuing until May 2002. Mitchell never saw anyone in or outside the bus, and she admitted that she did not look for anyone in the driver's seat. On two or three occasions, the bus was backing up as she came over a hill, such that she drove ahead of it after she turned south onto Meadow Ridge Drive. Each day, she backed into her driveway and exited her vehicle to check her mail. On occasion, the bus would pass while Mitchell checked her mail, and as it did one day, from 12 to 15 feet away, Mitchell observed Bruna driving the bus with a little boy on board who appeared to be either on Bruna's lap or sitting very close to him. Mitchell observed this two to four times between February and May 2002.

Scott Daly, a resident of the Meadow Oaks subdivision, testified that he uses Cornish Road to travel to and from work, traveling on it every other day, and that Cornish Road traverses rolling hills. Daly noticed a change in the morning route of the bus at issue after Christmas 2001. At that time, the bus began turning east onto Cornish Road instead of making a U-turn upon reaching Cornish Road. Daly had a child who rode the bus to school in the morning, and Daly several times observed two

young boys open the door while standing by the door mechanism near Bruna. One of those boys had dark hair and glasses. On April 11, 2002, between 4 and 4:10 p.m., Daly observed the bus parked near the intersection of Cornish Road and Meadow Ridge Drive as Daly drove westbound on Cornish Road. Daly stopped on the left side of the bus. He saw Bruna sitting in the driver's seat and a boy approximately 10 or 11 years old with brown hair and glasses sitting in the seat behind the bus' door, across the aisle from Bruna. He saw no other people inside the bus and did not recall whether the bus' engine was running. Daly rolled down his window and asked Bruna whether he needed help, and Bruna responded, " 'Nope, missed the turn.' " Daly proceeded westbound on Cornish Road at about 5 m.p.h. and continued to watch the bus in his mirror as he pulled away. He did not feel that Bruna had missed the turn; he had an "odd feeling" and was waiting for the bus to move. About 20 or 30 seconds after Daly left the bus, it backed up and proceeded down the road.

Wheeler testified that as the school resource officer, he was responsible for anything that occurred within the district's school system. On May 17, 2002, Wheeler received information from the school superintendent regarding suspicious activity involving a bus near the intersection of Meadow Ridge Drive and Cornish Road. That day, Wheeler and the superintendent went to the area in an unmarked car and stayed for about an hour, but observed no suspicious activity.

On the afternoon of May 20, 2002, Wheeler returned to the area alone in a marked car and observed the same intersection and the Meadow Oaks subdivision from a hill on Cornish Road. Wheeler saw the bus at issue dropping off students in the Meadow Oaks subdivision. The bus then proceeded to the intersection of Meadow Ridge Drive and Cornish Road, stopped, parked on Cornish Road, and stayed there for exactly 6 minutes. Wheeler could not see inside the bus. Wheeler observed the bus back up and go south on Meadow Ridge Drive, back to the Meadow Oaks subdivision. Wheeler followed the bus and saw it stop in the subdivision at B.T.'s residence. A boy exited the bus. The bus proceeded through the subdivision, and Wheeler initiated a traffic stop. Bruna appeared to be the only person on the bus, and he told Wheeler that he had been cleaning the bus

while stopped on Cornish Road and that A.T. was the child who had exited the bus.

Another deputy with the Sarpy County sheriff's office testified that she investigated the present case and arrested Bruna. At the time of the arrest, she obtained identifying information about Bruna and determined his birthday to be September 8, 1969.

The jury found Bruna guilty of first degree sexual assault on a child under § 28-319, and the trial court sentenced him to 15 to 50 years' imprisonment in the custody of the Nebraska Department of Correctional Services and ordered him to pay costs. We summarize and discuss the trial judge's additional comments below.

## III. ASSIGNMENTS OF ERROR

On appeal, Bruna alleges, consolidated and restated, that the trial court erred in (1) excluding a videotape interview between Bruna and law enforcement officers; (2) allowing the public defender's office to withdraw; (3) overruling Bruna's motion for continuance; (4) denying Bruna's motion to appoint a special prosecutor; (5) limiting voir dire regarding pretrial publicity; (6) allowing the State's expert to testify as to the veracity of A.T., the behavior of sex abuse victims, and the behavior of sexual offenders; (7) not allowing a demonstration on the schoolbus; (8) overruling Bruna's motion for directed verdict; (9) refusing to recuse the trial judge from sentencing; and (10) imposing an excessive sentence.

Bruna also assigns that his trial counsel was ineffective (1) for failing to raise the proper objections during the State's expert's testimony and (2) for failing to elicit expert testimony before offering certain exhibits.

Bruna further claims that he was prejudiced by the court reporter's failure to record certain bench conferences.

## IV. STANDARD OF REVIEW

■ A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support the verdict. *State v. Spurgin*, 261 Neb. 427, 623 N.W.2d 644 (2001).

■ A motion for continuance is addressed to the discretion of the court, and in the absence of a showing of an abuse of

discretion, a ruling on a motion for continuance will not be disturbed on appeal. *State v. Turner*, 252 Neb. 620, 564 N.W.2d 231 (1997).

■ Generally, the extent to which parties may examine jurors as to their qualifications rests largely in the discretion of the trial court, the exercise of which will not constitute reversible error unless clearly abused, and where it appears that harmful prejudice has been caused thereby. *State v. Harrold*, 256 Neb. 829, 593 N.W.2d 299 (1999).

■ The exercise of judicial discretion is implicit in determinations of relevancy under Neb. Rev. Stat. § 27-401 (Reissue 1995) and prejudice under Neb. Rev. Stat. § 27-403 (Reissue 1995), and a trial court's decision regarding them will not be reversed absent an abuse of discretion. *State v. Mowell*, 267 Neb. 83, 672 N.W.2d 389 (2003).

## V. ANALYSIS

### 1. EXCLUSION OF VIDEOTAPE

Prior to trial, the State filed a motion in limine requesting that the court prohibit Bruna from introducing evidence regarding an interview of Bruna conducted on May 23, 2002, at the Sarpy County Law Enforcement Center, including any videotape thereof, because the videotape thereof which the State had reviewed contained references to a polygraph test, evidence of which is inadmissible, and because the videotape was inadmissible as self-serving hearsay. Following a hearing, the trial court granted the motion.

On appeal, Bruna assigns that the trial court erred in granting the motion, arguing that the videotape only incidentally mentioned a polygraph test and that by excluding a videotape which contained prior consistent statements, the trial court chilled Bruna's right to testify in his own defense. However, Bruna did not make an offer of proof at trial on this matter.

■ It is not the office of a motion in limine to obtain a final ruling upon the ultimate admissibility of the evidence. *Gerken v. Hy-Vee, Inc.*, 11 Neb. App. 778, 660 N.W.2d 893 (2003) (citing *Molt v. Lindsay Mfg. Co.*, 248 Neb. 81, 532 N.W.2d 11 (1995)). In order to preserve any error before an appellate court, the party opposing a motion in limine which was granted must make an

offer of proof outside the presence of the jury unless the evidence is apparent from the context within which questions were asked. See *id.* (citing *Thrift Mart v. State Farm Fire & Cas. Co.*, 251 Neb. 448, 558 N.W.2d 531 (1997), *overruled on other grounds, Hornig v. Martel Lift Systems*, 258 Neb. 764, 606 N.W.2d 764 (2000)). Because Bruna failed to make an offer of proof regarding the videotape, he failed to preserve that claim.

## 2. WITHDRAWAL OF PUBLIC DEFENDER

On December 30, 2002, the Sarpy County public defender's office, having been appointed prior to trial to represent Bruna, moved for an order allowing it to withdraw as Bruna's counsel because of a conflict of interest. On December 31, the trial court denied the motion. At a January 28, 2003, hearing, the public defender's office orally renewed its motion to withdraw. Bruna's counsel, Patrick Boylan, a deputy Sarpy County public defender, argued that the public defender's office had a conflict of interest in representing Bruna because A.T.'s mother was a court reporter for a Sarpy County Juvenile Court judge and another attorney employed full time by the public defender's office was before that court weekly or daily. Boylan stated that he himself had known A.T.'s mother for 15 years and had seen her regularly as she recorded depositions at his former private practice and as she worked for the Douglas County District Court while Boylan worked for the Douglas County public defender's office. At the hearing, Bruna stated, "I would prefer to have someone appointed from outside the public defender's office." On February 3, the trial court excused the public defender's office from representing Bruna and appointed another attorney at the county's expense. Trial commenced on March 3. On appeal, Bruna assigns that the trial court erred in allowing the public defender's office to withdraw as his counsel.

In determining whether or not to disqualify a defense counsel, the court must balance two Sixth Amendment rights: (1) the defendant's right to be represented by counsel of choice and (2) his or her right to a defense conducted by an attorney who is free of conflicts of interest. *State v. Ehlers*, 262 Neb. 247, 631 N.W.2d 471 (2001) (citing *Wheat v. United States*, 486 U.S. 153, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988)). The U.S. Supreme Court has

also acknowledged an independent interest of the courts in conducting criminal trials within the ethical standards of the legal profession and which appear fair to all who observe them. See *id.* The Nebraska Supreme Court has recognized that counsel may be disqualified to avoid potential errors, and where the problem is brought to the court's attention before trial, the trial court is given broad discretion in determining whether a conflict warranting disqualification of counsel exists. See *State v. El-Tabech*, 225 Neb. 395, 405 N.W.2d 585 (1987) (court-appointed counsel disqualified because of potential conflict of interest).

In this case, Bruna's counsel presented evidence of a long-standing professional connection between attorneys of the public defender's office, including himself, and A.T.'s mother. It is possible that such a connection would have given rise to an actual conflict of interest, or at the very least, the appearance of impropriety. Based on these facts, we conclude that the trial court did not abuse its broad discretion in allowing the public defender's office to withdraw as Bruna's counsel.

Bruna relies on the proposition that

> [o]nce counsel has been appointed for an indigent accused, the accused must remain with the appointed counsel unless one of the following conditions is met: (1) The accused knowingly, voluntarily, and intelligently waives the right to counsel and chooses to proceed pro se . . . (2) appointed counsel is incompetent, in which case new counsel is to be appointed . . . or (3) the accused chooses to retain private counsel . . . .

(Citations omitted.) *State v. Sack*, 239 Neb. 690, 697-98, 477 N.W.2d 921, 926-27 (1991). Bruna argues that none of these conditions set forth in *Sack* were satisfied. However, as illustrated by *State v. El-Tabech, supra*, appointed counsel may be removed because of a potential conflict of interest, and such a conflict could, in effect, render a defendant's counsel incompetent to represent the defendant and warrant appointment of new counsel. Moreover, Bruna expressly acquiesced in the public defender's office's request to withdraw. A defendant in a criminal case may not take advantage of an alleged error which the defendant invited the trial court to commit. *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003). This assignment of error lacks merit.

### 3. Motion to Continue

On February 19, 2003, Bruna filed a written motion for continuance. He alleged that a continuance was warranted under Neb. Rev. Stat. § 29-1206 (Reissue 1995) to give him adequate time to consult with his new counsel, retain the services of a defense psychologist, and prepare for trial to ensure effective assistance of counsel. At a hearing on February 21, Bruna's counsel argued the same general grounds alleged in the written motion, and the trial court denied Bruna's motion. After denying the motion, the trial court confirmed that counsel had been furnished with a copy of the proceedings at Bruna's first trial on this matter, which had been declared a mistrial. At the same hearing, the trial court granted Bruna leave to retain an expert witness at the county's expense.

Bruna alleges that the trial court abused its discretion in denying his motion to continue. A motion for continuance is addressed to the discretion of the court, and in the absence of a showing of an abuse of discretion, a ruling on a motion for continuance will not be disturbed on appeal. *State v. Turner*, 252 Neb. 620, 564 N.W.2d 231 (1997). There is no abuse of discretion by a court in denying a continuance unless it clearly appears that the defendant suffered prejudice as a result thereof. See *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990).

Section 29-1206 provides:

> Applications for continuances shall be made in accordance with [Neb. Rev. Stat. §] 25-1148 [(Reissue 1995)], but in criminal cases in the district court the court shall grant a continuance only upon a showing of good cause and only for so long as is necessary, taking into account not only the request or consent of the prosecution or defense, but also the public interest in prompt disposition of the case.

Motions for continuance are governed by Neb. Rev. Stat. § 25-1148 (Reissue 1995), which provides:

> Whenever application for continuance or adjournment is made by a party or parties to any cause or proceeding pending in the district court of any county, such application shall be by written motion entitled in the cause or proceeding and setting forth the grounds upon which the application is made, which motion shall be supported by the affidavit or

affidavits of person or persons competent to testify as witnesses under the laws of this state, in proof of and setting forth the facts upon which such continuance or adjournment is asked. . . . Either party may, upon obtaining leave of the court, introduce oral testimony upon the hearing of such application.

We note that Bruna's written motion for continuance was not accompanied by an affidavit as required by § 25-1148. However, the failure to comply with the provisions of § 25-1148 is only a factor to be considered in determining whether a trial court abused its discretion in denying a continuance. See, *State v. Santos*, 238 Neb. 25, 468 N.W.2d 613 (1991); *State v. Perez*, 235 Neb. 796, 457 N.W.2d 448 (1990).

In *State v. Boyce*, 194 Neb. 538, 233 N.W.2d 912 (1975), counsel was appointed to represent the defendant slightly less than 1 month prior to trial. The defendant moved for a continuance " 'so that defendant's counsel can effectively prepare a defense.' " *Id.* at 539, 233 N.W.2d at 913. The Nebraska Supreme Court noted that there was no showing that any witnesses were unavailable or had not been interviewed, nor any showing that the defense would be prejudiced in any specific way. There was only the general complaint that time to prepare was short. The court concluded that the defendant had not made a satisfactory showing of good cause in support of his motion for continuance and that the trial court therefore did not abuse its discretion in denying the motion.

Similarly, Bruna's counsel requested a continuance for the general purposes of consulting with Bruna, retaining an expert, and preparing for trial. We cannot say the trial court abused its discretion in finding no good cause in support of Bruna's motion. Furthermore, Bruna's counsel had access to the record from Bruna's first trial on the matter and received leave to retain an expert at the county's expense. The record reflects that Bruna's counsel extensively cross-examined the State's witnesses and called witnesses to testify in Bruna's behalf. Based on the record, we cannot conclude that Bruna was prejudiced by the trial court's denial of his motion to continue. We conclude that the trial court did not abuse its discretion in denying Bruna's motion.

Bruna argues that in allowing the public defender's office to withdraw and appointing new counsel, the trial court is partially responsible for his counsel's lack of preparation. See *State v. Santos, supra*. However, as we concluded above, the record does not show a lack of preparedness on the part of Bruna's counsel or prejudice to Bruna, and the trial court did not abuse its discretion in refusing to grant a continuance.

### 4. SPECIAL PROSECUTOR

On February 25, 2003, Bruna filed a motion for appointment of a special prosecutor, citing for support A.T.'s mother's employment as a court reporter for the Sarpy County Juvenile Court. He further alleged, with reference to an attached affidavit by Boylan, that "the Sarpy County legal community is relatively small and close-knit" and that Boylan withdrew from his appointment as Bruna's counsel because of "his belief that . . . knowledge of [A.T.'s mother] amounted to a conflict of interest" in representing Bruna.

At a hearing on the motion, Bruna's counsel argued:

> I believe that the county attorney's office does practice in areas in which [its employees] would come into contact with the interested parties in this case and, as a safety mechanism, to ensure that [Bruna] is granted a fair trial and is provided all reasonable opportunity to seek a resolution to this case, that it would be a good idea for this Court to order that a special prosecutor be appointed.

The trial court denied Bruna's motion. On appeal, Bruna assigns that the trial court erred in denying his motion, arguing that the reasoning supporting the withdrawal of the public defender's office called for the appointment of a special prosecutor.

In *State v. Boyce*, 194 Neb. 538, 233 N.W.2d 912 (1975), the defendant was convicted of taking away, holding, or imprisoning a police officer against his will for the purpose of compelling the performance of an act by the officer, in violation of the kidnapping statute. The defendant moved for the appointment of a special prosecutor, and his motion was denied. On appeal, the Nebraska Supreme Court noted:

> "The county attorney is the public prosecutor, and his office is quasi judicial. In the discharge of the functions of

> that office he is called upon to exercise a sound discretion to distinguish between the guilty and the innocent, and to refrain from prosecuting those persons whose guilt is so doubtful that in his judgment justice will not be subserved by prosecutions, and there should not be anything in the way of private interest to possibly sway that judgment or to tempt him to depart from a disinterested and conscientious discharge of his duty."

*Id.* at 540, 233 N.W.2d at 913. The court affirmed and held that although the prosecutor would have been justified in disqualifying himself, he was not disqualified as a matter of law.

Unlike the public defender's office, which named specific persons, places, and time intervals in arguing in support of its motion to withdraw as counsel, Bruna failed to adduce specific evidence of a connection between A.T.'s mother and the county attorney's office; nor did he show that the county attorney had a "private interest" in the proceedings. We therefore conclude that the trial court did not err in denying Bruna's motion for the appointment of a special prosecutor.

### 5. RECORDING OF BENCH CONFERENCES

Prior to trial, the trial court made a docket entry granting Bruna's motion to record certain trial proceedings, including bench conferences. During trial, the court conducted eight bench conferences. Of those, the court reporter recorded the content of one, which was a conference initiated by the court. The remaining seven were not recorded and were designated "off the record" by the court reporter. Two were had "in low tones," and the other five were conducted "outside the hearing of the jury." Of the seven off-the-record conferences, two were initiated by the court, four were initiated by Bruna's counsel, and one was initiated by the State's attorney.

The record does show that three court reporters were involved in the recording of these proceedings, as the reporters' certificate shows the specific portions of the proceedings taken by each reporter. Bruna's request for recording appears in the proceedings taken by the first reporter. The record does not show any communication by the court or the first reporter to the subsequent reporters of the court's order to record the additional portions of the proceedings.

■ We take this opportunity to remind trial courts that upon request, a litigant is entitled to a verbatim record of anything and everything which is said by anyone in the course of judicial proceedings, that it is the duty of the court reporter to make such a record, and that it is the obligation of the trial court to see that the reporter accurately fulfills that duty. *Gerdes v. Klindt's, Inc.*, 247 Neb. 138, 525 N.W.2d 219 (1995).

On appeal, Bruna argues that he was prejudiced by the court reporter's failure to record bench conferences as ordered. He asserts that had the conferences been recorded as ordered, he would have been able to prove that the court was biased against him, and that the irregularity violated his right to due process and warrants a new trial.

■ Neb. Ct. R. of Prac. 5A (rev. 2000) provides:

(1) The official court reporter shall in all instances make a verbatim record of the evidence offered at [a] trial or other evidentiary proceeding, including but not limited to objections to any evidence and rulings thereon, oral motions, and stipulations by the parties. This record may not be waived.

(2) Upon the request of the court or of any party, either through counsel or pro se, the official court reporter shall make a verbatim record of anything and everything said or done by anyone in the course of trial or any other proceeding, including, but not limited to, any pretrial matters; the voir dire examination; opening statements; arguments, including arguments on objections; any motion, comment, or statement made by the court in the presence and hearing of a panel of potential jurors or the trial jury; and any objection to the court's proposed instructions or to instructions tendered by any party, together with the court's rulings thereon, and any posttrial proceeding.

Under this rule, in the absence of a request for the recording of additional proceedings pursuant to rule 5A(2), rule 5A(1) controls and requires only that the record contain the mandatory items listed in rule 5A(1). An appellant must present a record of his or her rule 5A(2) request for a record of additional proceedings. See *Bradley T. & Donna T. v. Central Catholic High Sch.*, 264 Neb. 951, 653 N.W.2d 813 (2002) (it is incumbent on party

appealing to present record which supports errors assigned, and absent such record, decision of lower court will be affirmed).

In this case, the record before us does not contain a motion by Bruna requesting a record beyond that required by rule 5A(1). We can infer the existence of a rule 5A(2) motion only from the trial court's reference at a hearing on February 28, 2003: "THE COURT: . . . The first motion I have is to record the voir dire, testimony, bench conferences, and closing arguments of counsel. That's granted, unless counsel waive that. So that's granted." The court's ruling suggests that the motion requested recording of such additional matters *unless waived by counsel.*

In *State v. Bradley,* 236 Neb. 371, 461 N.W.2d 524 (1990), the district court initially stated that it would require all proceedings to be recorded in accordance with the defendant's request. However, it later refused to allow the reporting of bench conferences, stating that objections should be made in open court so that they could be reported. On appeal, the defendant asserted that had the district court allowed the record he requested, on preparing for appellate review, he might have been alerted to the existence of errors which occurred at bench conferences or during other off-the-record discussions. The Nebraska Supreme Court noted that after the district court's later ruling mentioned above, it was incumbent upon the defendant to object in open court to any off-the-record discussions, further stating:

> While it is true that a party is entitled to have reported any comments made by a trial judge . . . it is, in the final analysis, in the absence of any prejudicial comment's being made in the presence of the jury, the correctness and effect of any questioned ruling which controls the disposition of an appeal. . . . Here, there is no claim the trial judge made any prejudicial comment in the presence of the jury, and the record is otherwise adequate to address the effect of the rulings [the defendant] questions. Thus, he has shown no prejudice by the district court's failure to provide him with the record he requested.

*Id.* at 391, 461 N.W.2d at 539. The court concluded that without a showing of prejudice, an omission from a bill of exceptions does not vitiate a defendant's conviction. *Id.*

Here, like the defendant in *State v. Bradley, supra,* Bruna does not allege that the trial judge made prejudicial comments in the presence of the jury; and here, the record reflects that the bench conferences were not heard by the jury, being conducted either in low tones or outside the hearing of the jury. By not objecting to the unrecorded bench conferences, Bruna waived the recording of such conferences. As explained in *Bradley,* trial rulings speak for themselves, and the record herein is sufficient to assess the correctness of the rulings which were the subject of those bench conferences. Bruna implies that we should infer bias in sentencing from the content of unrecorded bench conferences on trial rulings. However, our analysis below of the judge's comments at sentencing dispenses with this issue, and we need not address it further.

### 6. VOIR DIRE OF PROSPECTIVE JURORS

Prior to beginning voir dire of the prospective jurors, the trial judge stated:

> The Court will do voir dire. And I'll tell you when I begin the Court's voir dire, I will tell [the jurors] that there's been a lot of publicity about this case, that if they've heard or seen something about this case and have formed an opinion that they cannot lay aside, I want them to raise their hands. I'll give them a little chance to think about that. In other words, it's not the publicity, it's that they formed an opinion. And once I've done that, I'm going to tell both counsel that's it, you're not going further into any examination about pretrial publicity. I find that both sides have contributed to that from what I've seen. But if [the opinions] are there and [the jurors] can't lay [them] aside, I'll excuse [the jurors].

Neither party raised any objection to this procedure. When the prospective jurors were seated, the trial judge stated:

> There's been much publicity about this case. The evidence will show that [Bruna] was a school bus driver during the time alleged and that [A.T.] was a student who was a passenger on the school bus. You may have read something in the newspaper or heard something in the news or from other sources. I would ask you to reflect now if you have done so and would ask you to reflect if you have

formed an opinion as to the guilt or innocence of [Bruna] at this time, to search your mind and ask yourself that question. If you've already formed an opinion that you cannot lay aside, then I want to know that. It's not that you heard or read about it, but it's that you already formed an opinion.

I'll instruct you later that before you decide a case you must only decide it based on the evidence presented during the trial and your common sense that you have. In other words, the only evidence you would have is that which is presented in this open court.

Reflecting on that, have any of you — and I would ask you to raise your hand — formed an opinion now as a result of that publicity as to the guilt or innocence of [Bruna]? If so, please raise your hand. Seeing none, I will continue with the Court's examination.

Neither party requested any further opportunity to examine the prospective jurors following the court-conducted voir dire and the ensuing initial voir dire by both parties.

■ On appeal, Bruna assigns that the trial court erred in conducting limited voir dire regarding pretrial publicity. He argues that the en masse voir dire conducted by the trial court afforded him "no way of judging[,] at the time a prospective juror was drawn, whether the prospective juror was aware of prejudicial information about the case," brief for appellant at 26, and precluded intelligent use of his peremptory challenges. Bruna also assigns that the trial court erred in conducting an en masse voir dire with respect to pretrial publicity because it denied him the opportunity to support his pretrial motion to change venue. However, Bruna failed to object to the voir dire procedure outlined by the court or to request additional opportunity for voir dire after the court's and parties' initial inquiry, and "[i]t is a well-settled principle that one may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error." *State v. Bjorklund*, 258 Neb. 432, 468, 604 N.W.2d 169, 204 (2000) (error waived where defendant failed to object to prosecutor's questions at voir dire). See, also, *Yount v. Seager*, 181 Neb. 665, 150 N.W.2d 245 (1967) (ordinarily, if party makes no challenge for cause and accepts jurors, party waives any objection to their selection as

jurors). We therefore decline to address these assignments of error, as they were not preserved for appeal. We further note that "[g]enerally, the extent to which parties may examine jurors as to their qualifications rests largely in the discretion of the trial court, the exercise of which will not constitute reversible error unless clearly abused, and where it appears that harmful prejudice has been caused thereby." *State v. Harrold*, 256 Neb. 829, 861, 593 N.W.2d 299, 321 (1999) (citing *Yount v. Seager, supra*).

## 7. Expert Testimony

Bruna assigns that the trial court erred in allowing Dr. Theodore J. DeLaet, the psychologist called by the State, to testify regarding the veracity of A.T., the behaviors exhibited by victims of sexual abuse, and the behaviors of sexual offenders.

Prior to trial, pursuant to *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), the State moved for a hearing to evaluate expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and requested an order declaring the expert testimony to be offered at trial admissible. The trial court granted the hearing and found that DeLaet could testify on the characteristics of an adult sexual abuser of a child, the characteristics of a child sexually abused by an adult, and the area of children's false claims of sexual abuse by an adult. The trial court found that these areas of expertise had been subject to peer review and generally accepted in the psychological community.

At trial, DeLaet, a psychologist licensed to practice in Nebraska since 1986, testified that his practice includes treating children and adolescents who have been sexually abused, as well as perpetrators of sexual abuse. Over the years, DeLaet had seen well over 100 but fewer than 500 children believed to be victims of sexual abuse. He had assessed or treated approximately 100 sexual offenders. The court received DeLaet's curriculum vitae outlining DeLaet's extensive education and experience in the area of psychology.

DeLaet testified that in evaluating the veracity of a claim of sexual abuse, a psychologist must look at all available information. Specific factors for consideration include whether the allegation is specific or vague; loss of self-esteem; changes in

emotions; frequency of nightmares or flashbacks; hostility, depression, or withdrawn behavior; how the allegations came to light; physical signs and symptoms; and outside information relevant to the accuser's truthfulness. Evaluating these factors is not an exact science; the existence of one symptom does not indicate whether abuse actually happened, and the presence of these factors could be consistent with innocent behavior. After considering all the available information, a psychologist conducts a process of deductive reasoning. If a child denies to peers or adults that sexual abuse has occurred, it does not necessarily indicate that claims of sexual abuse are false; the child may feel that a person asking about sexual abuse is not entitled to the information and may deal with the situation by saying nothing, saying something different happened, or saying nothing happened. DeLaet testified at some length, without objection, about the types of behavior and emotional changes that a victim of sexual abuse may exhibit.

Later, Bruna's counsel made his only substantive objections to DeLaet's testimony:

> [The State's attorney, to DeLaet:] Now, in addition to these items that you have identified you would consider in the assessment, how would you — what does your training, your education, your experience tell you about how the child who is believed to be a victim would interact with peers, parents or other adults?

> [Bruna's counsel]: Objection, Your Honor: Relevance.

> THE COURT: Overruled.

> [DeLaet]: As mentioned earlier, it's not uncommon that the child's behavior changes, so [the child] might become — most often what we tend to see is that the child will tend to become less social, more withdrawn from others. Another common set of behaviors that is noted is when other people approach the child to disclose about what happened to him or her, that creates —

> [Bruna's counsel]: Objection, Your Honor: Relevance.

> THE COURT: Overruled.

> [DeLaet]: — the child then has a conflict about what do I say or do I say anything? And if so, do I tell 'em what happened or do I tell 'em something different to get 'em to

go away? So in those circumstances, we always look for changes in social interactions.

DeLaet testified that the manner in which an initial disclosure of sexual abuse was made is important to investigating a claim. If the individual who conducted the initial investigation told the child that he or she thought the child was lying, DeLaet would be concerned that the child was coerced into claiming something happened when in fact nothing happened, especially if the individual conducting the investigation were someone the child had been taught to trust and respect. Children may make false accusations if they are intimidated or scared, and most children have been trained to be respectful to authority figures, which training could cause a child to say what he or she thinks the authority figure wants to hear. Children could fashion their answers to escape an uncomfortable situation, and a child who is asked numerous times about sexual abuse and denies it could answer in the affirmative based on previous reactions to the denials. A child might make false accusations to avoid being punished for lying, and a child might continue to make false accusations out of fear of retracting the initial allegation.

DeLaet acknowledged that emotional and behavioral changes in a child could stem from the child's being coerced into making a false accusation. When a child asserts to peers that sexual abuse did not occur, it may be because the child is not comfortable talking about it, but it could also be because no sexual abuse occurred. Signs of shame could be present when a child feels compelled not to tell the truth about whether abuse took place. DeLaet would look at the consistency of the child's story in determining the veracity of a claim of sexual abuse, as variations in the story could indicate a false claim.

DeLaet testified that there is a predictable pattern of behavior exhibited by an adult who perpetrates sexual abuse upon a child. The perpetrator identifies a potential victim days, weeks, months, or years in advance of the sexual abuse. The perpetrator's intent may not have been sexual initially, but it may end up that way. Usually, a trust building or friendship building period ensues, wherein the perpetrator leads the child to trust him or her through seemingly normal activities. At some point, either gradually or in a specific instance, the perpetrator crosses

the line from friendship to sexual abuse. The breach of trust may cause the child to become conflicted about trusting the perpetrator and trusting himself or herself, creating trauma. To prevent discovery of the abuse, the perpetrator will usually use threats of violence or shame the child into keeping the abuse a secret.

### (a) Relevance of Expert Testimony

█ Although Bruna assigns that DeLaet's testimony constituted improper "vouching" testimony and otherwise improper testimony about the behaviors of sexual abusers, we address only the relevance of DeLaet's testimony, because Bruna's counsel did not raise other grounds by objection; a party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003); *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002).

█ Neb. Rev. Stat. § 27-702 (Reissue 1995) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Determining whether an expert's testimony or opinion will be helpful to a jury or assist the trier of fact in accordance with § 27-702 involves the discretion of the trial court, whose ruling on admissibility of an expert's testimony or opinion will be upheld on appeal absent an abuse of discretion. See, *State v. Duncan*, 265 Neb. 406, 657 N.W.2d 620 (2003); *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992).

In *State v. Roenfeldt, supra*, the Nebraska Supreme Court approved the use of expert testimony concerning the profile of a child abuse victim, specifically such a victim's feelings, symptoms, and behaviors. The Nebraska Supreme Court explained that the profile evidence was relevant and admissible under § 27-702 because " '[f]ew jurors have sufficient familiarity with child sexual abuse to understand the dynamics of a sexually abusive relationship,' and 'the behavior exhibited by sexually abused children is often contrary to what most adults would expect.' " 241 Neb. at 39, 486 N.W.2d at 204. In light of § 27-702 and

*Roenfeldt*, we conclude that DeLaet's testimony regarding the behaviors of victims of sexual abuse was relevant and that the trial court did not err in allowing it over Bruna's objections. We also conclude that the trial court did not abuse its discretion in allowing DeLaet's testimony regarding the behaviors of sexual offenders, because it also was relevant for aiding the jurors in understanding the dynamics of a sexually abusive relationship.

Bruna alleges that DeLaet's testimony was irrelevant because it was not preceded by evidence that A.T. exhibited, exclusively during the periods of time when the alleged abuse occurred, the behaviors of sexual abuse victims about which DeLaet testified. However, whether A.T. exhibited those general behaviors during the time period when the abuse occurred goes not to the admissibility of DeLaet's testimony, but, rather, to the weight to be given the evidence, which is the province of the fact finder, not this court. See *State v. Shipps*, 265 Neb. 342, 656 N.W.2d 622 (2003).

### (b) Ineffective Assistance of Counsel

Bruna asserts that he received ineffective assistance of counsel because his counsel did not raise the proper objections to DeLaet's testimony. To sustain a claim of ineffective assistance of counsel as a violation of the state and federal Constitutions, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defendant, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

As we stated above, DeLaet's testimony was relevant and admissible because it assisted the jury in understanding the nature of a sexually abusive relationship, a topic with which most laypeople are unfamiliar. See *State v. Roenfeldt, supra*.

Bruna relies on *State v. Doan*, 1 Neb. App. 484, 498 N.W.2d 804 (1993), to argue that DeLaet's testimony constituted improper " 'vouching' " testimony to which his counsel failed to object. Brief for appellant at 16. In that case, a testifying psychologist had examined and interviewed a child alleging sexual abuse

by the defendant and expressed the opinion that the child's allegations had been validated by her behaviors. We concluded that an expert witness may not give such testimony, because such testimony expresses an opinion that the child is believable, that the child is credible, or that the witness' account has been validated.

Although the State's questions in this case were couched in terms of the veracity of a claim of sexual abuse, DeLaet merely described characteristics generally observed in perpetrators and victims of sexual abuse. DeLaet did not interview or examine A.T.; nor did he express an opinion, directly or indirectly, about A.T.'s veracity or credibility. He did not comment upon the weight to be given certain factors. Because DeLaet's testimony did not offer such an opinion or make such comment, we conclude that Bruna's reliance on *State v. Doan, supra,* is misplaced.

Bruna contends that his trial counsel was deficient in failing to make foundational objections to DeLaet's testimony concerning the behaviors of sexual offenders and their victims and the evaluation of the veracity of a victim's claims. At trial, the State established DeLaet's credentials and experience as a psychologist licensed to practice in Nebraska. DeLaet testified that over the years, he had treated hundreds of children and adolescents who had been sexually abused, as well as approximately 100 perpetrators of sexual abuse. Based on these facts, we conclude that the State laid sufficient foundation for DeLaet to testify as an expert under § 27-702 and that Bruna's trial counsel was not deficient in not objecting to DeLaet's testimony on foundational grounds.

Bruna argues that his trial counsel was deficient in not objecting to DeLaet's sexual offender testimony on grounds of prejudice. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." § 27-403. As noted above, DeLaet testified only in general terms about the behaviors of sexual offenders and their victims and about evaluating the veracity of claims of abuse. He did not specifically refer to Bruna or A.T. or express an opinion concerning the credibility of either, and his testimony clearly was intended only to assist the jurors in understanding a topic with which they likely were not familiar. Therefore, we conclude that

Bruna's counsel was not deficient in failing to object to DeLaet's testimony based on prejudice.

### (c) Plain Error

Bruna argues but does not assign that although his counsel did not object to the portions of DeLaet's testimony about which Bruna complains, the trial court committed plain error in allowing DeLaet's testimony.

> Errors which are neither assigned nor argued will not be considered by an appellate court. . . . Although an appellate court ordinarily considers only those errors assigned and discussed in the briefs, the appellate court may, at its option, notice plain error. . . . Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

(Citations omitted.) *State v. Paul*, 256 Neb. 669, 677, 592 N.W.2d 148, 155 (1999). "Plain error applies when an appellate court discovers error on the record; it is not a broad assertion to be assigned by the parties on appeal." *State v. Egger*, 8 Neb. App. 740, 751, 601 N.W.2d 785, 795 (1999). We find no plain error in this regard.

### 8. Schoolbus Demonstration

Prior to trial, Bruna moved to have the bus brought for observation by the jury. At a hearing on the motion, Bruna's counsel argued:

> [A]lthough according to the affidavit the bus may not be in the same condition as it was at the time of the incident, in that it's been cleaned, it's been washed and whatnot, the bus will still be in the same condition as it relates to the dimensions, the width of the aisle, the width of the seats, the condition of the front of the bus where the motor hub comes out. And I believe in order for the jury to get a grasp and an accurate depiction of the incident involving this bus, the best way to allow the jury to see that is to bring the bus itself and not rely on a photograph.

The trial court granted Bruna's motion and stated, "They can park it out back here and they can run through it without discussion." The State's attorney asked the court whether the jury merely would inspect the bus, or whether questioning of witnesses would occur on the bus. The trial court clarified that the jurors would "just walk through and walk back." At trial, the trial court told the jury, "[I]f the bus is going to be out back, you can wait and go through the bus without talking or having anyone talk to you."

On appeal, Bruna argues that the trial court erred in not allowing Bruna to demonstrate that "the size of the bus would have precluded . . . Bruna from being in the positions that were attributed to him by A.T." Brief for appellant at 41. However, Bruna's counsel did not request such a demonstration, and when an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *State v. Davlin*, 265 Neb. 386, 658 N.W.2d 1 (2003); *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002). We therefore decline to address this assignment further in this appeal.

Bruna argues but does not assign that his trial counsel was ineffective in "failing to make a proper record regarding the method by which the jurors were instructed to view the bus." Brief for appellant at 43. Allegations of ineffective assistance of counsel must be set forth in the assignments of error. *State v. Gerstner*, 244 Neb. 508, 507 N.W.2d 490 (1993). Alleged errors that are not both assigned and argued in the brief on appeal will not be considered by an appellate court. See *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003).

## 9. MOTION FOR DIRECTED VERDICT

Bruna contends that the trial court erred in overruling his motions for directed verdict at the close of the State's case and at the close of trial. Whether a trial court should have granted a motion for directed verdict at the close of the State's case is a question of law, regarding which an appellate court must reach a conclusion independent of the determination reached by the court below. See *State v. Johnson*, 9 Neb. App. 140, 609 N.W.2d 48 (2000). In a criminal case, a court can direct a verdict only when

there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Segura*, 265 Neb. 903, 660 N.W.2d 512 (2003). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law and a verdict may not be directed. *Id.*

Under § 28-319(1), "[a]ny person who subjects another person to sexual penetration . . . (c) when the actor is nineteen years of age or older and the victim is less than sixteen years of age is guilty of sexual assault in the first degree." For the purpose of this offense, sexual penetration includes fellatio, which is oral stimulation of the penis. Neb. Rev. Stat. § 28-318(6) (Reissue 1995). The State charged Bruna with violating § 28-319(1)(c) between December 1, 2001, and May 20, 2002, at or near Meadow Ridge Drive and Cornish Road in Sarpy County. The State's case established that A.T. was born on January 27, 1990, and that Bruna was born on September 8, 1969. A.T. testified in detail that between Christmas 2001 and the end of his sixth grade year in 2002, Bruna had repeatedly subjected him to oral sex in a schoolbus parked on Cornish Road near Meadow Ridge Drive. Several witnesses corroborated A.T.'s testimony that Bruna routinely parked the bus at that location after school. The State presented evidence supporting every element of its case against Bruna, and we conclude that the trial court did not err in overruling Bruna's motions for directed verdict.

### 10. DNA Evidence and Ineffective Assistance of Counsel

Bruna assigns that his trial counsel was ineffective in "failing to elicit expert testimony prior to offering exhibits."

A criminalist for the Nebraska State Patrol crime laboratory testified, on direct examination by Bruna's counsel, that he examines items of evidence collected by law enforcement agencies for the presence of body fluids and does DNA testing if necessary. He conducted analyses in the present case, and his report was received in evidence. It reflects that the crime laboratory received several items, including a pair of green shorts, from the Sarpy

County sheriff's office. At no time during trial did Bruna's counsel present evidence showing how or where the Sarpy County sheriff's office obtained the green shorts. The report reflects that the criminalist found evidence of semen on the green shorts. Upon examination by Bruna's counsel, the criminalist testified that he knew of no test that could discern whether the semen found on the shorts was the result of a nocturnal emission.

A DNA analyst with the Nebraska State Patrol crime laboratory testified, on direct examination by Bruna's counsel, that her duty is to examine items of evidence for the presence of blood, other body fluid, and hair; to perform a DNA analysis on any found; and to compile a report. She testified that she "performed the DNA analysis" in the present case. Her report, which was received in evidence, states that she found evidence of semen on a pair of green shorts, that "Bruna can be included as a source of the DNA [on] the green shorts," and that "[A.T.] can be excluded as [a] source of the DNA on the green shorts." She also testified that in examining items for the presence of DNA, she is not able to determine whether any DNA evidence found resulted from a nocturnal emission.

Bruna specifically argues that before offering the DNA analyst's report in evidence, his counsel should have elicited testimony explaining to the jury that the green shorts belonged to Bruna. He contends, "As the record now stands, it is impossible to decipher who wore the shorts and whose DNA was found to be on those shorts. The impression left on the jury was that the shorts belonged to [A.T] and that . . . Bruna's DNA was found to be on those shorts." Brief for appellant at 44.

As set forth above, to sustain a claim of ineffective assistance of counsel as a violation of the state and federal Constitutions, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defendant, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

No evidence was presented as to the ownership of the green shorts. The evidence showed only that Bruna's semen had been

identified on a pair of green shorts provided to the crime laboratory by the Sarpy County sheriff's office and that there was no way to determine whether the semen was from a nocturnal emission. Contrary to Bruna's argument, we cannot see how this evidence would leave the jury with the impression that the green shorts belonged to A.T. Bruna did not demonstrate a reasonable probability that but for such performance by his counsel, the outcome of his trial would have been different. Even if Bruna's counsel had established Bruna as the owner of the shorts, there was ample evidence of Bruna's guilt, namely A.T.'s account of the sexual abuse perpetrated by Bruna. Therefore, we conclude that this assignment of error is without merit.

### 11. STATEMENTS AT SENTENCING

After his conviction but before sentencing, Bruna filed a motion requesting that the trial judge recuse himself. There is no copy of that motion in the transcript, but the trial judge referred to the motion before sentencing Bruna and overruled it. Bruna asserts that the trial judge abused his discretion in failing to recuse himself from sentencing Bruna. Although Bruna's counsel discussed at oral argument an earlier motion to recuse, Bruna's assignment of error, read in context, clearly addresses only the later motion to recuse.

In regard to the motion to recuse made after conviction and prior to sentencing, Bruna's brief on appeal focuses on statements made by the trial judge before pronouncing the sentence. The judge began with the following:

> Okay. I probably would be better off not saying anything and simply imposing a sentence. The last time I sentenced a person that could be labeled as a "pedophile" I quoted from an author — a learned man — that happened to be a contributor to the Bible. The case was reversed and resentenced by another judge to probation. If people would continue to read that author, they would find that it's not a message of condemnation, but of hope.

The judge commended A.T. on his bravery in testifying and then continued:

> I had a life experience involving a friend when I was in the sixth grade. A man came to Bellevue as a teacher . . . .

He organized basketball teams for young persons after school. He was always hugging and kissing the young people and we thought he was a great guy. One night he had one of the young people stay overnight at his house. He did a terrible thing. The young person reported this to his parents, the man left town without a trial. That young person grew up to be a football player, was selected as a Class B All State player, but even the mention of this man's name would bring him to tears.

We are asked to determine whether these comments demonstrate that the trial judge based Bruna's sentence on personal bias, thereby committing an abuse of discretion. A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998). An abuse of discretion occurs when the sentencing court's reasons or rulings are clearly untenable and unjustly deprive the defendant of a substantial right and a just result. See *id.*

In *State v. Pattno, supra*, the Nebraska Supreme Court vacated the male defendant's sentence for sexual assault on a male child after the trial judge read a lengthy excerpt from the Bible that addressed homosexuality in a negative light. The trial judge in the present case was the same trial judge making the statements in *Pattno*. The *Pattno* court determined that the reasonable person test adopted in *Dowd v. First Omaha Sec. Corp.*, 242 Neb. 347, 495 N.W.2d 36 (1993), constituted the proper standard by which to determine whether a judge was biased against a defendant and therefore whether that judge should have recused himself from imposing a sentence. In such a case, the defendant "must demonstrate that a reasonable person who knew the circumstances of the case would question the judge's impartiality under an objective standard of reasonableness, even though no actual bias or prejudice was shown." *State v. Pattno*, 254 Neb. at 740, 579 N.W.2d at 508. The *Pattno* court found that the trial judge had "interjected his own religious views immediately prior to sentencing" and concluded that "a reasonable person could conclude that the sentence was based upon the personal bias or prejudice of the judge." 254 Neb. at 743, 579 N.W.2d at 509. The court stated:

> Statements of religious expression by a judge or remarks which suggest that the judge dislikes the crimes committed by a defendant do not necessarily evidence improper bias or prejudice. . . . However, courts are well advised to rely upon the statutory guidelines for imposing sentences. Reliance upon irrelevant material, such as the court's own religious beliefs, could convince a reasonable person that a court was biased or prejudiced.
>
> The problem is that during [the defendant's] sentencing, the trial judge read a biblical scripture and then stated that he had considered the circumstances and the "nature . . . of the defendant" in reaching the sentence of not less than 20 months' nor more than 5 years' imprisonment. A reasonable person who heard the judge's comments could have questioned the judge's impartiality.

(Citations omitted.) *Id.* at 742, 579 N.W.2d at 509.

Bruna speculates in his brief that the trial judge was, himself, the "friend" to whom he alluded prior to sentencing and that as a victim of sexual abuse himself, the trial judge could not be deemed impartial by a reasonable person. There is simply no evidence in the record to support Bruna's conjectures about the identity of the friend to whom the trial judge referred, and Bruna's argument in this regard is without merit. Bruna further argues that even if the trial judge had not been a victim of sexual abuse, his comments were not relevant to Bruna's sentencing and strongly suggested a judicial bias. If considered alone, the comments regarding the childhood experience of the judge's friend might be viewed merely as a reflection of the potential harm caused to a victim by this type of crime. Neb. Rev. Stat. § 29-2260 (Reissue 1995) prescribes some of the factors to be considered upon sentencing, including whether the crime "caused [or] threatened serious harm," § 29-2260(3)(a). However, the reference to the childhood friend must be viewed in light of the other sentencing comments, which were more troublesome.

The trial judge expressly referred to "[t]he last time [he] sentenced a person that could be labeled as a 'pedophile.'" The judge expressly identified the source of a quotation he had recited at that prior sentencing as the Bible. The judge expressly

acknowledged that the sentencing in that prior case was vacated on appeal. These comments unmistakably identify the subject matter of *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998), which included an extensive quotation from the Bible. The judge's comment then characterizes the Biblical message from the prior case as one of hope rather than condemnation, at least implicitly suggesting that the Nebraska Supreme Court in *Pattno* had misinterpreted the quotation and the judge's motive and purpose in reading from the Bible at the prior sentencing.

We put aside the issue of whether it is inappropriate for a trial judge to publicly criticize the Supreme Court's decision reviewing the judge's actions in a prior case. In light of *Pattno*, which authority the judge raised by his own comments clearly referring to that prior case's sentencing phase, the judge has again inserted his own religious views in a sentencing proceeding. The *Pattno* analysis contemplates application of an objective test by a reasonable person knowing all of the facts. A reasonable person knowing all of the facts would be aware of the Supreme Court's decision in *Pattno* and the circumstances surrounding its disposition, and to such a person objectively taking into account the judge's referring to that prior case, his implicitly criticizing the appellate review of the prior decision, and his arguing for characterization of the Biblical quotation as "a message [not] of condemnation, but of hope," the insertion of personal religious views becomes explicit and unmistakable.

We are not stating that reference to the Bible may never be made in a sentencing proceeding. But, as the Supreme Court strongly advised in *Pattno*, courts are well advised to rely upon the statutory guidelines for imposing sentences. The danger of confusion and the suggestion of injection of personal religious views generally counsel against such Biblical references.

Here, considered in the context of the reference to *Pattno*, the reference to personal religious views is, again, unmistakable. In this case, as in *Pattno*, a reasonable person could conclude that the trial judge based the sentence upon personal bias or prejudice, thereby depriving the defendant of due process and abusing the judge's discretion.

## 12. EXCESSIVE SENTENCE

Bruna assigns as error that the court imposed an excessive sentence. Because the matter must be remanded for resentencing by a different judge, we need not address this claim.

## VI. CONCLUSION

For the foregoing reasons, we conclude that Bruna's assigned errors regarding pretrial motions and the trial proceedings are without merit. Because of the trial court's sentencing comments, we vacate the sentence and remand the cause with directions that Bruna be resentenced by a different judge.

SENTENCE VACATED, AND CAUSE
REMANDED FOR RESENTENCING.