Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/30/2018 08:12 AM CDT

State of Nebraska, appellee, v.
Patrick R. Russell, appellant.
___ N.W.2d ___

Filed March 30, 2018.    No. S-17-197.

1. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.
4. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.
5. ____. Where a defendant was under the age of 18 when he or she committed a Class IA felony, Neb. Rev. Stat. § 28-105.02 (Reissue 2016) dictates that the sentencing judge must also consider mitigating factors, such as the defendant's (1) age at the time of the offense, (2) impetuosity, (3) family and community environment, and (4) ability to appreciate risks and consequences of the conduct, as well as (5) the outcome of a comprehensive mental health evaluation of the defendant conducted by an adolescent mental health professional licensed in Nebraska.

Appeal from the District Court for Douglas County: Thomas A. Otepka, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Annie O. Hayden for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, and FUNKE, JJ., and PIRTLE and BISHOP, Judges.

CASSEL, J.

## INTRODUCTION

In 1974, a court sentenced Patrick R. Russell to life imprisonment for a murder he committed at age 17. Following decisions in *Miller v. Alabama*[1] and *State v. Mantich*,[2] Russell sought postconviction relief in the form of a new sentencing hearing. The court granted relief and resentenced Russell to 110 to 126 years' imprisonment, making him eligible for parole at age 72. Because the sentence does not constitute an abuse of discretion, we affirm.

## BACKGROUND

### CRIME AND DIRECT APPEAL

The facts and circumstances surrounding Russell's crime are set out in greater detail in our decision resolving his direct appeal.[3] On November 10, 1973, when Russell was 17 years old, he engaged in sexual activities with 8-year-old Joseph Edmonds. After Edmonds allegedly called Russell's grandmother derogatory names, Russell used a pocketknife to cut a length of telephone cord. He told Edmonds to close his eyes, slipped the cord around Edmonds' neck, and pulled it tight. Edmonds died due to the strangulation.

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

[2] *State v. Mantich*, 287 Neb. 320, 842 N.W.2d 716 (2014).

[3] *State v. Russell*, 194 Neb. 64, 230 N.W.2d 196 (1975).

Our prior opinion also discussed Russell's mental condition. At age 14, he was hospitalized for psychiatric treatment for approximately 1 month. Russell then resided at the Omaha Home for Boys for approximately 2 years. He returned to live with his mother in July 1973, and he was soon charged with three counts of assault and battery related to sexual attacks on young boys ranging from 4 to 8 years of age.

The district court convicted Russell of murder in the first degree and imposed a sentence of life imprisonment. We affirmed the court's judgment.[4]

POSTCONVICTION AND RESENTENCING

Following decisions in *Miller*[5] and *Mantich*,[6] Russell sought postconviction relief. He asked the district court to vacate and set aside his sentence and to hold a new sentencing hearing. The district court granted the requested relief.

The district court received evidence at a mitigation hearing. It received the deposition of an adolescent neuropsychologist who discussed newer revelations in science concerning the development of the adolescent brain. It also received documents regarding Russell's misconduct reports, achievements while incarcerated, and reclassification forms used by the penitentiary to determine placement.

The district court heard live testimony from a witness. Kirk A.B. Newring, Ph.D., a psychologist, testified that studies show the brains of adolescents are not fully formed. He explained that the prefrontal cortex—which allows for deliberation, anticipation of future outcomes, assessment of risk, and impact—seems to be more fully developed around age 25. The lack of prefrontal cortex development is most demonstratively impaired in "hot logic situations where there's emotional arousal." Newring testified that Russell reported a strong

---

[4] *Id.*

[5] *Miller v. Alabama, supra* note 1.

[6] *State v. Mantich, supra* note 2.

attachment to his grandmother as the only relative who had a parenting-type relationship toward him. Newring gathered from his talks with Russell that Russell admitted to the crime to appease the parole board but was now saying that he did not do it. Russell explained that his attorney performed inadequately and that Russell was innocent.

Newring testified that with regard to classification, since 2011, Russell had scores that would allow him to be at a community corrections center if he were not serving a life sentence. In other words, Russell "has the institutional behavior and history that would allow him to be placed at work release," but instead, Russell is kept in total confinement due to the nature of his sentence. The presentence report (PSR) shows that during many annual custody reviews from at least 1989 to 2000, no change was recommended in Russell's classification due to his refusal to take part in a psychological evaluation. He submitted to a psychological evaluation in 2002. That evaluation recommended that Russell complete all three levels of both "GOLF" (for mental health) and "SATOP" (for substance abuse) programming prior to being considered for a custody promotion. In 2002 through 2005, his classification was not changed, because the mental health recommendation was not favorable.

Newring assessed Russell at a low risk for future acts of violence. The risk factors were that Russell had a conviction of violence and a personality disorder. Newring assigned Russell a diagnosis of "Other Personality Disorder with Mixed Schizoid and Schizotypal Personality features" to "encapsulate that he's a little bit asocial" and that "his presentation and perceptions are a little bit odd or eccentric." Newring testified that Russell described a feasible and achievable release plan and recognized that he would need to work through the transition process of the Department of Correctional Services. Newring did not believe that Russell had any meaningful family support in the community. Newring explained that Russell was employable, did not have a major mental illness, had a

good work history, handled stress fairly well within the institution, and was cognizant of a need for supportive transition, all of which suggested a low risk for future acts of violence. Russell obtained a low score on a test that is a predictor of future violence.

The record showed steps taken by Russell to improve himself while incarcerated. In 1981, Russell obtained a diploma through the GED program and earned credentials of ministry in the "Church of the God Within." The next year, the church awarded him an honorary doctor of divinity. The record shows that Russell completed other Bible studies. In 1988, he obtained a certificate in welding. Performance reviews show that Russell had an "exceptional" work history in prison. Between 1991 and 2016, Russell had 26 misconduct reports, with the most recent occurring in 2010.

According to the PSR, "Russell remains in a Pre-Contemplative Stage of Change with regard to addressing his criminogenic needs." Testing tools found Russell to be at a very high risk to reoffend. The report stated that Russell appeared to be unwilling to accept he has mental health problems and that his personality disorder would likely impact efforts to address his criminogenic needs.

Although Russell does not see himself as having a mental illness, his history suggests otherwise. On two occasions in 1969, Russell was hospitalized at a psychiatric center after exhibiting violence toward family members. Russell was hospitalized in 1970 with an admission diagnosis of adolescent schizophrenia. After an evaluation, a doctor felt that Russell "represented borderline retardation and adolescent adjustment reaction." Russell acknowledged that as a juvenile, he was seen by a psychiatrist, and that he was diagnosed with schizophrenia in 1972. In a Nebraska Penal and Correctional Complex progress report from March 1975, the author strongly recommended that Russell be placed in a mental institution. In a report the following year, the counselor stated that Russell should be under psychiatric care.

Upon admission to a psychiatric hospital in 1978, Russell indicated that he had no mental disorders. However, staff perceived him as "having a severe mental disorder, and the main feature of which is paranoia." An admission note and mental status examination report from that year stated that Russell, as an adolescent, carried a knife or a section of pipe on his person "for his own protection or in case someone bumped into him or in case he didn't like someone's face." Russell reported that he had "attacked people from behind and struck them with the pipe because he didn't like their looks or because they had accident[al]ly bumped into him on the street." In this report, Russell offered strong racial opinions and indicated that he could get along with African Americans, "provided that they do not talk to him or look at him the wrong way." The report showed a diagnostic impression of "Schizophrenia, Paranoid Type."

The PSR shed light on crimes committed by Russell prior to the murder. In December 1972, a 7-year-old boy reported that Russell inserted a pencil in the victim's rectum, made the victim perform oral sex on Russell, and pulled on the victim's penis and testicles. When interviewed by the police, Russell stated that among other actions against the victim, he "tied a cord around [the victim's] neck, and threatened to hang him over the side of the porch railing from the third floor for messing with the TV." Russell told the officer that the victim harassed him, which made Russell angry, and that Russell was unable to control his temper. When an officer spoke with Russell's mother, she informed him that Russell had been staying at the Omaha Home for Boys because he was "hard to handle," but that he was home on holiday leave. She also said that prior to his admittance to the Omaha Home for Boys, Russell was receiving care from a doctor for "a [m]ental problem." Russell told an officer that if he had been "taking medicine for his condition," he "possibly would not have done what he did" to the victim. In November 1973, Russell was charged with stealing a vehicle.

The PSR stated that Russell appeared to have a deep-seated need for power and control and that interpersonal relationships were problematic for Russell. It further stated that Russell's level of suspicion toward authority figures "does not bode well for his prospects of succeeding in community-based supervision." Russell showed "very little motivation to participate actively and meaningfully in a correctional plan." According to the report, Russell "appears to be dreaming of living under a bridge in a warm climate."

In February 2017, the court resentenced Russell. The court stated that it had spent days "going through everything" in preparation for the sentencing. The court recounted that it had reviewed the entirety of the PSR and opinions from this court as well as *Miller*.[7] The court further stated that it considered Russell's age, mentality, education and experience, social and cultural background, past record of criminal or law-abiding conduct, motivation for the offense, nature of the offense, and amount of violence involved in the commission of the crime. In addition, the court weighed mitigating factors under Neb. Rev. Stat. § 28-105.02(2) (Reissue 2016). The court reviewed this court's opinion in Russell's direct appeal[8] and considered the evidence at the mitigation hearing.

The district court disagreed with Newring that Russell was impulsive. The court observed that on the same page of Newring's report that Newring said Russell was impulsive, Newring wrote that Russell was now contending he did not commit the murder. The court noted that on a number of occasions in the PSR, it was reported that Russell denied and minimized responsibility for his actions and felt he had the right to defend his grandmother's name. The court recalled reading that Russell had also blamed his attorney for not properly representing him.

---

[7] *Miller v. Alabama, supra* note 1.

[8] *State v. Russell, supra* note 3.

The district court recognized the importance of considering mitigating factors before sentencing a juvenile offender. It stated:

> [T]he State doesn't challenge the vast body of neuroscientific and developmental science in adolescents that have implications for the treatment of juveniles in the justice system, and ultimately led to *Miller* [*v.*] *Alabama*. Before *Miller* [*v.*] *Alabama*, in 2012, a murder conviction meant a life sentence, regardless of the age of the actor. Since *Miller*, if the actor was under 18, the Court must consider mitigating factors before imposing a life sentence for murder.
>
> . . . We are here today because of a change in the law that applies to cases like this across the country. *Miller* [*v.*] *Alabama* requires the courts to — across the country at the state level to consider mitigating factors before sentencing a person who was under 18 at the time of the murder.
>
> And I've mentioned the change in the law that our legislature made because of *Miller* [*v.*] *Alabama*, [§] 28-105.02, and all of the nonexhaustive list of mitigating factors, which the Court considered.
>
> In attempting to fashion a fair and appropriate sentence — resentence, excuse me, based on the law and the evidence, the Court does so within the context of the facts of this case. All sentences are driven in part by the particular facts unique to them, and I mentioned this earlier. So it's this case, these facts, that the Court considers.
>
> The legislature has set the minimum sentence in these kinds of cases at 40 years. And it has set the maximum sentence at life. And where this case falls in that spectrum is ultimately left to the Court to determine.

The district court recognized that it must "also consider a sentence that will not depreciate the seriousness of the crime and serve to protect society." The court resentenced Russell to 110 to 126 years in prison, with credit for 15,789 days served.

Thus, the court stated that Russell would be eligible for parole after serving 55 years and, if he did not lose any good time, would be discharged after serving 63 years.

Russell timely appeals.

## ASSIGNMENT OF ERROR

Russell assigns that the district court abused its discretion by imposing an excessive sentence.

## STANDARD OF REVIEW

[1,2] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[9] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[10]

## ANALYSIS

We have recently decided a number of appeals involving juvenile offenders convicted of first degree murder who were sentenced to life imprisonment, who were subsequently resentenced in response to *Miller*, and who then appealed that sentence.[11] This is another such appeal. Our prior cases set forth the legal background leading to the resentencing of juvenile offenders, and we do not repeat it here.

Russell argues that his sentence of 110 to 126 years' imprisonment is excessive. He does not suggest that the court imposed

---

[9] *State v. Jones*, 297 Neb. 557, 900 N.W.2d 757 (2017), *cert. denied* ___ U.S. ___, 138 S. Ct. 656, 199 L. Ed. 2d 549 (2018).

[10] *Id.*

[11] See, *State v. Jones, supra* note 9; *State v. Jackson*, 297 Neb. 22, 899 N.W.2d 215 (2017); *State v. Nollen*, 296 Neb. 94, 892 N.W.2d 81 (2017), *cert. denied* ___ U.S. ___, 138 S. Ct. 165, 199 L. Ed. 2d 98; *State v. Garza*, 295 Neb. 434, 888 N.W.2d 526 (2016), *cert. denied* ___ U.S. ___, 138 S. Ct. 83, 199 L. Ed. 2d 54 (2017); *State v. Mantich*, 295 Neb. 407, 888 N.W.2d 376 (2016), *cert. denied* ___ U.S. ___, 138 S. Ct. 128, 199 L. Ed. 2d 78 (2017).

a sentence outside the statutory limits; instead, he contends that the court abused its discretion in imposing the sentence. We disagree.

[3-5] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.[12] Relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.[13] Because Russell was under the age of 18 when he committed a Class IA felony, § 28-105.02 dictates that the sentencing judge must also consider mitigating factors, such as the defendant's (1) age at the time of the offense, (2) impetuosity, (3) family and community environment, and (4) ability to appreciate risks and consequences of the conduct, as well as (5) the outcome of a comprehensive mental health evaluation of the defendant conducted by an adolescent mental health professional licensed in Nebraska.[14]

Russell asserts that his sentence should be modified because it was tailored to fit the crime rather than the offender. He emphasizes decisions from the U.S. Supreme Court recognizing the reduced culpability of juveniles and developments in the field of neuropsychology.[15] We, like the district court, are

---

[12] *State v. Smith*, 295 Neb. 957, 892 N.W.2d 52 (2017), *cert. denied* ___ U.S. ___, 138 S. Ct. 315, 199 L. Ed. 2d 208.

[13] *Id.*

[14] See *id.*

[15] See, *Miller v. Alabama, supra* note 1; *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005).

mindful of evidence showing that the brain of an adolescent is not fully developed. But that does not necessarily mean that an offender no longer poses a risk after age 25.

Under *Miller*, a juvenile offender convicted of a homicide offense may be sentenced to life imprisonment without parole so long as the sentencer considered specific, individualized factors before handing down that sentence.[16] Rather than life imprisonment, the court sentenced Russell to a term of years that allows for parole eligibility. And it is clear from the court's statements during the resentencing hearing that it considered the relevant sentencing factors set forth above.

Russell also argues that the sentence imposed was a de facto life sentence. He will be eligible for parole at age 72, and he will be 80 years old on his projected release date. Russell highlights cases from other states where courts have found shorter terms of imprisonment to be de facto life sentences.[17] But we have declined to follow that line of cases.

In *State v. Smith*,[18] we considered a claim that a lengthy term-of-years sentence was a de facto life imprisonment. In doing so, we discussed in some detail the U.S. Supreme Court's decision in *Graham v. Florida*.[19] The *Graham* Court found it unconstitutional to sentence a nonhomicide juvenile offender to a "sentence [that] guarantees he [or she] will die in prison without any meaningful opportunity to obtain release."[20] But we noted that the Court had not decided whether a lengthy term-of-years sentence was, for constitutional purposes, the same as a sentence of life imprisonment

---

[16] *State v. Nollen, supra* note 11.

[17] See, *Casiano v. Commissioner of Correction*, 317 Conn. 52, 115 A.3d 1031 (2015), *cert. denied* ___ U.S. ___, 136 S. Ct. 1364, 194 L. Ed. 2d 376 (2016) (50-year sentence); *State v. Ronquillo*, 190 Wash. App. 765, 361 P.3d 779 (2015) (mandatory release at age 68).

[18] *State v. Smith, supra* note 12.

[19] *Graham v. Florida, supra* note 15.

[20] *Id.*, 560 U.S. at 79.

without the possibility of parole. We observed that "a number of courts have held that sentences that allow the juvenile offender to be released in his or her late sixties or early seventies satisfy the 'meaningful opportunity' requirement."[21] We also recognized that "other courts have interpreted *Graham* to mean that the juvenile offender must be released a certain number of years *before* his life expectancy."[22] Ultimately, we concluded in *Smith* that a sentence for kidnapping in which the juvenile offender would be eligible for parole at age 62 comported with the principles set forth in *Graham*.

Although this case involves a homicide, our analysis in *Smith* provides guidance. The *Miller* Court highlighted that the reasoning from *Graham* still applied to homicide offenses:

> *Graham*'s flat ban on life without parole applied only to nonhomicide crimes, [but] none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. . . . So, *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.[23]

And, in a homicide case,[24] we adhered to our conclusions in *Smith*. There, we found no merit to the juvenile offender's contention that his parole eligibility at age 56 was unconstitutional.

We digress at this point to recognize the reversal of *State v. Zuber*,[25] a New Jersey case that we have discussed[26] and cited[27] approvingly. In that case, the sentences imposed on a

---

[21] *State v. Smith, supra* note 12, 295 Neb. at 977, 892 N.W.2d at 65.

[22] *Id.* (emphasis in original).

[23] *Miller v. Alabama, supra* note 1, 567 U.S. at 473.

[24] See *State v. Jones, supra* note 9.

[25] *State v. Zuber*, 442 N.J. Super. 611, 126 A.3d 335 (2015), *reversed* 227 N.J. 422, 152 A.3d 197 (2017).

[26] See *State v. Cardeilhac*, 293 Neb. 200, 876 N.W.2d 876 (2016).

[27] See *State v. Smith, supra* note 12.

juvenile offender for nonhomicide crimes totaled 110 years but the offender would be eligible for parole in 55 years at approximately age 72. The Superior Court of New Jersey assumed, but did not decide, that *Graham* could apply. As part of its analysis, it used life expectancy tables, which predicted that the offender would outlive his parole ineligibility period. The court concluded that the aggregate sentence was not a de facto life sentence, because the offender had a meaningful and realistic opportunity to obtain release. We thus included this case as one in which a court found that a lengthy term of years was not the equivalent of a life sentence.[28] Slightly over 1 year ago, the New Jersey Supreme Court reversed, and remanded for resentencing.[29] It found that lengthy term-of-years sentences imposed on juveniles implicated the principles of *Graham* and *Miller*. It directed that at the new sentencing hearing, the trial court should consider the offender's "'immaturity, impetuosity, and failure to appreciate risks and consequences'; 'family and home environment'; family and peer pressures; 'inability to deal with police officers or prosecutors' or his own attorney; and 'the possibility of rehabilitation.'"[30]

The theme emerging from all the jurisprudence discussed above is that a sentencing court must consider a juvenile offender's "youth and attendant characteristics"[31] in fashioning a punishment. The district court has done that here. And we are mindful that the U.S. Supreme Court has not precluded a court from imposing a sentence of life imprisonment without possibility of parole for a juvenile convicted of homicide. The *Miller* Court stated: "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different,

---

[28] See, *id.*; *State v. Cardeilhac, supra* note 26.

[29] *State v. Zuber*, 227 N.J. 422, 152 A.3d 197 (2017).

[30] *Id.* at 453, 152 A.3d at 215.

[31] *Miller v. Alabama, supra* note 1, 567 U.S. at 483.

and how those differences counsel against irrevocably sentencing them to a lifetime in prison."[32] While Russell will not be eligible for parole until age 72, the sentence imposed affords a "meaningful and realistic opportunity to obtain release"[33] from prison. We cannot say that the court abused its discretion in resentencing Russell.

## CONCLUSION

The record shows that the district court considered principles from *Miller* and the relevant sentencing factors. Because the district court did not abuse its discretion in resentencing Russell to 110 to 126 years in prison, we affirm.

Affirmed.

Wright and Kelch, JJ., not participating.

---

[32] *Id.*, 567 U.S. at 480.

[33] *State v. Smith, supra* note 12, 295 Neb. at 979, 892 N.W.2d at 66.