Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/27/2018 09:08 AM CDT

State of Nebraska, appellee, v.
Markel D. Steele, appellant.
___ N.W.2d ___

Filed July 27, 2018.    No. S-17-951.

1.  **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
2.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3.  **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.
4.  **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.
5.  ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Lancaster County: John A. Colborn, Judge. Affirmed.

Jeffrey Pickens and Kelly S. Breen, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, and PAPIK, JJ., and DOBROVOLNY, District Judge.

PAPIK, J.

Markel D. Steele pled guilty to one count of second degree murder and one count of first degree assault for his involvement in an armed robbery and shooting that left one victim dead and another paralyzed. Steele, who was 17 years old at the time of the offenses, was sentenced to 60 years' to life imprisonment for second degree murder and to 40 to 50 years' imprisonment for first degree assault, with the sentences to run consecutively. Because we find no merit to the contentions Steele raises on appeal regarding his sentences, we affirm.

## BACKGROUND

*Factual Basis for Charges.*

The following details regarding the incident underlying Steele's convictions are summarized from the factual basis recited by the State at Steele's plea hearing.

On April 18, 2016, at approximately 3 p.m., law enforcement responded to a report of gunshots at a residence near 19th and Euclid Streets in Lincoln, Nebraska. Dispatchers relayed to law enforcement that approximately eight gunshots were heard in the residence and that "two black males" were seen leaving the residence around the time of the shooting. One was reported as wearing black jeans and a gray hoodie with the letters "USA" on the back, and the other was wearing jeans and a black "puffy" coat.

As officers first arrived in the area, they located a black male wearing black jeans and a gray hoodie with the letters "USA" walking westbound a block or two from the reported location of the shooting. This individual, later identified as Xheronte Lewis, was detained by police and admitted to being at the residence when shots were fired.

Inside the residence, officers located two victims, identified as Christopher Coleman and Jerry Griffis, both of whom had sustained gunshot wounds. Officers also found a dog that was suffering from gunshot wounds. Three small children were also present in the residence.

Coleman, who was found just inside the front doorway in the living room, was pronounced dead at the scene. Griffis, who was found in the kitchen, was transported to a nearby hospital where he received extensive treatment for a gunshot wound that passed through his spine. The dog was taken to an emergency veterinary clinic where it died from its wounds.

An autopsy on Coleman later revealed that the cause of his death was a gunshot wound to the neck. Griffis was hospitalized for approximately 1½ months as a result of his injuries. He was diagnosed with multiple gunshot wounds, a vertebra fracture, paraplegia, "right and left hemopneumothorax," bilateral pulmonary contusion, and a rib fracture. He is now partially paralyzed.

Griffis gave a statement to police approximately a week after the shooting. He stated that he had gone to Coleman's house on April 18, 2016, to sell him some marijuana. While there, he heard the front door open and immediately heard two gunshots in quick succession. He stated that he could not see the shooter initially, but could see Coleman facing the shooter. He then saw Coleman turn "180 degrees" and fall to the floor and believed that Coleman was struck by one or both of the shots fired. Griffis stated that he then observed a black male in his early twenties wearing all black clothing holding a black semiautomatic handgun.

Griffis reported that the black male shot Coleman's dog two or three times when it appeared in the kitchen doorway. The dog yelped and ran to its kennel toward the back of the kitchen. Immediately after shooting the dog, the black male pointed the gun at Griffis and fired one or two shots into his torso. Griffis immediately fell to the ground. When he looked up, the black male had walked a few steps toward him and was pointing the gun at his head. Griffis put his left hand out

in front of the gun in an attempt to block a shot to his head. He heard another gunshot and felt pain on his hand and face. Griffis stated that he "played dead" in order to avoid being shot again.

After the last shot, Griffis heard two male voices in the kitchen. He "heard the male closest to him, presumably the shooter, say, . . . Where's it at? Find the shit . . . ." He then heard the intruders rifling through cabinets and drawers. A quantity of marijuana was later found to have been taken from the residence. Using a photograph that had been posted on Facebook, Griffis was able to identify Steele as the shooter.

Investigators processed the crime scene and recovered seven bullet casings from the residence. Two spent rounds were found in the dog's body, one round was collected from Griffis' body, and two rounds were discovered at the residence. A firearms analyst concluded that all of the bullets were fired from the same gun, which was identified as a "Hi-Point JHP" .45-caliber firearm.

Investigators also took photographs and castings of fresh footprints from the kitchen floor and from the mud in the backyard of the residence, which appeared to be consistent with Nike "Air Force" tennis shoes. A witness described Steele as having worn Nike "Air Force or Air Max" tennis shoes at the time of the shooting. When Steele was later arrested, he was wearing Nike "Air Force" tennis shoes, which were seized by police and analyzed at the Nebraska State Patrol crime laboratory. The analyst found that the castings and photographs of the footprints taken at the crime scene corresponded to the pattern and size of Steele's left shoe.

Steele was arrested and interviewed by police on May 5, 2016. He denied any involvement in the robbery or homicide, but admitted that he had a Facebook account and that he used Facebook to communicate with others. Investigators obtained a search warrant to access his Facebook records, which showed that on April 7, Steele was in communication with Lewis about possibly doing a narcotics-related robbery on Euclid Street. This conversation continued over the course

of 11 days while the two attempted to find a gun and a driver for the robberies. The conversation included a screen shot of a text message conversation in which Lewis asked another individual to drive. That individual then asked Lewis where this would occur, and Lewis responded, "'Euclid.'"

After that individual declined to participate, Steele told Lewis that he found a driver named "T.J.," later identified as Terique Jackson, and that they would be over to pick him up in a BMW, which was the vehicle Jackson was driving at the time.

Lewis was deposed and testified that he observed Steele with a black .45-caliber semiautomatic handgun just before the robbery and homicide on Euclid Street. He also testified that Jackson was the driver who transported them to the Euclid Street residence on April 18, 2016, and that Lewis made plans with Steele to meet up after the robbery.

While incarcerated at the Lancaster County jail, Steele admitted to more than one confidential informant that he had shot Coleman and Griffis on April 18, 2016, at the Euclid Street residence.

Steele was 17 years old on the date of the offenses.

*Steele's Guilty Pleas.*

Steele was initially charged with eight different felony offenses arising out of the incident on Euclid Street: first degree murder, first degree assault, robbery, abandonment or cruel neglect of an animal, and four counts of the use of a firearm to commit a felony. The parties later advised the district court that they had reached a plea agreement. Under the agreement, Steele would plead guilty to an amended information which reduced his first degree murder charge to second degree murder, retained the first degree assault charge, and dropped the other six counts. As part of the plea agreement, the State also agreed to dismiss various charges it had filed against Steele in Lancaster County District Court arising out of two different incidents and to forgo any additional charges based on those other incidents.

Steele entered guilty pleas in accordance with the parties' agreement. The district court accepted the pleas after concluding that there was a sufficient factual basis for the pleas and that Steele understood the nature of the charges and made the plea freely, voluntarily, knowingly, and intelligently.

*Sentencing Hearing.*

At the sentencing hearing, the district court acknowledged receipt of the presentence investigation report and heard arguments from both parties. Then, prior to imposing sentences, the district court stated:

> In determining the appropriate sentences, the Court considers a number of factors. I recognize that Mr. Steele was 17 years of age when these crimes were committed. Although I do not believe that the Court is required to do so, I have followed the requirements of *Miller versus Alabama*, where the United States Supreme Court indicated that the court consider the juvenile's special circumstances in light of the principles and purposes of juvenile sentencing, and I have taken into account how children are different and how these differences counsel against irrevocably sentencing a juvenile to a lifetime in prison.
>
> I have considered the defendant's age; mentality; education and experience; social and educational background and cultural background; past criminal record or record of law abiding conduct; motivation for the offense; the nature of the offense; the amount of violence involved in the commission of the crime.
>
> And although not required to do so, I have also considered the mitigating factors which led to the commission of this offense as set forth in Nebraska Revised Statute Section 28-105.02. I have considered the age of the defendant; the impetuosity of the defendant; his family and community environment; his ability to appreciate the risk and the consequences of the conduct; his intellectual capacity; and the mental health evaluation that was

submitted by defense counsel from the mental health professional, including all of the statutory mitigating factors; including information from the family, which includes prenatal history, developmental history, medical history, substance abuse treatment history, social history and psychological history.

The Court has also considered and cannot ignore the senselessness of these acts of violence; the motivation for the crime, to steal marijuana; the premeditated actions, this crime had been planned for some time; there was no provocation for these offenses. I've considered that the defendant used a firearm to commit these crimes. And I have considered the depravity of these crimes, cold-blooded shooting and killing of Mr. Coleman, and the cold-blooded shooting of Mr. Griffis, numerous times, and leaving him for dead, and he is now permanently paralyzed.

I've considered that you shot and killed the dog. Considered that fact that your intent was to leave no witnesses. And I considered the fact that Mr. Coleman's three children were present in the home when you shot and killed him. I've considered the effect that these crimes have had on the family members of Mr. Coleman, including his three children, who will grow up now without a father. I've considered the effect that it has had on Mr. Griffis, he's paralyzed for life. And the effect that this has had on his daily life, for the rest of his life.

I considered your other acts of violence, and although you've not been convicted of those other crimes, they were in the Presentence Report, including an armed robbery, that, again, was for marijuana, and included the taking of a four-year-old girl from a vehicle, and brought into an apartment where an armed robbery was in progress.

I do have to consider the safety of the public. You are dangerous. Society needs to be protected from your dangerousness.

Having regard for the nature and circumstances of the crimes, and the history, character and condition of the defendant, and all other relevant factors, including the age, mentality, education and experience, social and cultural background, past criminal record, motivation for the offense, nature of the offense, amount of violence involved, impetuosity of the defendant, family and community environment, your ability to appreciate the risk and consequences of your conduct, your intellectual capacity, and the mental health evaluation, including all of the factors set forth in *Miller versus Alabama*, *Graham versus Florida*, and all of the mitigating factors set forth in Section 28-105.02.

The Court does find that imprisonment of the defendant is necessary for the protection of the public, because the risk is substantial that during any period of probation the defendant would engage in additional criminal conduct, and because a lesser sentence would depreciate the seriousness of the defendant's crimes and promote disrespect for the law.

The district court then pronounced its sentences. It sentenced Steele to 60 years' to life imprisonment for second degree murder. It sentenced Steele to 40 to 50 years' imprisonment for first degree assault. It ordered the sentences to run consecutively. The court also advised Steele that he would be eligible for parole in 50 years.

## ASSIGNMENTS OF ERROR

On appeal, Steele assigns, rephrased, that the district court abused its discretion (1) in imposing a "*de facto* life sentence," and (2) in imposing excessive sentences.

## STANDARD OF REVIEW

[1,2] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Russell*, 299 Neb. 483, 908 N.W.2d 669 (2018). An abuse of discretion occurs when a trial court's

decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

## ANALYSIS

*De Facto Life Sentence.*

In many recent appeals to this court, individuals convicted of offenses committed while they were juveniles have challenged their sentences, arguing that the sentence imposed is unlawful because it amounts to a "de facto life sentence" that is not permitted under the U.S. Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), or *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). See, e.g., *State v. Thieszen, ante* p. 112, 912 N.W.2d 696 (2018); *State v. Russell, supra*; *State v. Smith*, 295 Neb. 957, 892 N.W.2d 52 (2017). Steele makes such an argument here, contending that under *Miller*, a "*de facto* life sentence" can only be imposed upon a finding that the offender is "*irreparably corrupt*." Brief for appellant at 8.

In *Miller v. Alabama, supra*, the U.S. Supreme Court held that a sentence of mandatory life imprisonment without parole for a juvenile violated the Eighth Amendment's prohibition on cruel and unusual punishment. *Miller* did not, however, foreclose the possibility of a life-without-parole sentence for a juvenile. Such a sentence may be imposed so long as the court considers specific, individualized factors before handing down that sentence. See *State v. Russell, supra*.

Steele, like previous challengers, urges us to find that *Miller* places an additional restriction on life-without-parole sentences. According to Steele, life-without-parole sentences are permitted by *Miller* only if the offender is found to be "*irreparably corrupt*." Brief for appellant at 8. Steele contends that because no such finding was made by the district court here, his sentences are unlawful.

Under the sentences the district court imposed, Steele will be eligible for parole in 50 years, or when he is 67 years old. While some other states have found that a sentence expressed as a term of years may constitute a de facto life sentence, we have not done so. See *State v. Russell, supra*. On the other hand, we have found that sentences that allow for a "meaningful and realistic opportunity to obtain release" are not de facto life sentences for purposes of *Miller v. Alabama, supra*, or *Graham v. Florida, supra*. See *State v. Russell*, 299 Neb. at 495, 908 N.W.2d at 677 (*Miller*). Accord, *State v. Thieszen, supra* (*Miller*); *State v. Smith, supra* (*Graham*).

In *State v. Russell, supra*, we found the defendant's sentence allowed him a "meaningful and realistic opportunity to obtain release" and thus was not a de facto life sentence. That sentence did not make the offender eligible for parole until he was 72 years old. As Steele will be eligible for parole at age 67, our decision in *Russell* leaves no room for a determination that Steele received a de facto life sentence. We thus need not decide whether *Miller* requires a finding that the offender is "irreparably corrupt" for a life-without-parole sentence, because Steele did not receive such a sentence. Steele's first assignment of error is meritless.

*Excessive Sentences.*

Steele also argues that the district court imposed excessive sentences. Steele does not argue that his sentences were outside the statutory limits. Rather, he argues that the court abused its discretion in imposing the sentences.

[3-5] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Russell*, 299 Neb. 483, 908 N.W.2d 669 (2018). Relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and

experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Thieszen, ante* p. 112, 912 N.W.2d 696 (2018).

Steele contends that the district court abused its discretion in various ways, but we disagree in every respect. First, we reject Steele's argument that the district court abused its discretion by not considering certain factors set forth in Neb. Rev. Stat. § 29-2260(3) (Reissue 2016), which, he contends should have been considered as mitigating factors. Section 29-2260(3) sets forth factors that courts are to consider when deciding "if it is appropriate to withhold a sentence of imprisonment and grant probation." *State v. Cerritos-Valdez*, 295 Neb. 563, 569, 889 N.W.2d 605, 610 (2017). Neither the language of § 29-2260(3) nor logic would permit us to find that district courts are required to consider the § 29-2260(3) factors in cases like this one, in which a probation-only sentence would not even be *permitted* by statute. See Neb. Rev. Stat. §§ 28-304(2) and 28-308(2) (Reissue 2016) and 28-105 (Supp. 2017).

While the district court was not required to specifically consider the factors set forth in § 29-2260(3), the district court did state that it had considered the familiar factors set forth above, which courts customarily consider and apply in fashioning any sentence. In particular, after noting that it had considered Steele's age when he committed the offenses, the court said it took "into account how children are different and how these differences counsel against irrevocably sentencing a juvenile to a lifetime in prison." The court also stated that it had considered, among other things, Steele's impetuosity, his family and community environment, and a mental health evaluation that

was submitted by defense counsel. But the court also stated that it had considered the senselessness of Steele's actions, as well as the motivation behind them (to steal), the lack of provocation, and the depravity that was exhibited by shooting and killing one person and leaving another permanently paralyzed. We cannot say that the court abused its discretion in its assessment of the relevant sentencing factors.

Neither are we persuaded by Steele's argument that the district court relied on personal bias or prejudice in determining his sentences. Steele cites to *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998), and *State v. Bruna*, 12 Neb. App. 798, 686 N.W.2d 590 (2004), in support of this argument. In *Pattno*, we vacated a sentence, concluding that the court's reliance on "personal religious beliefs as a basis for a sentencing decision injects an impermissible consideration in the sentencing process." 254 Neb. at 742, 579 N.W.2d at 509. In *Bruna*, the Nebraska Court of Appeals, citing *Pattno*, also vacated a sentence on the ground that the sentencing judge had considered his personal religious views when sentencing the defendant.

Unlike the defendants in *Pattno* and *Bruna*, Steele does not point to any specific information or beliefs that he contends the district court improperly relied upon in sentencing him. Without any elaboration from Steele as to what particular beliefs or information he contends improperly motivated the district court, we have no basis to vacate his sentences on the ground of bias.

## CONCLUSION

Because we find that the district court did not abuse its discretion in sentencing Steele, we affirm.

AFFIRMED.