IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. HALL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

ANTHONY J. HALL, APPELLANT.

Filed September 24, 2019.    No. A-18-1102.

Appeal from the District Court for Lancaster County: LORI A. MARET, Judge. Affirmed.

David J. Tarrell, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

### INTRODUCTION

Following a stipulated bench trial, Anthony J. Hall was convicted in the district for Lancaster County of two counts of manufacturing, distributing, delivering, dispensing, or possessing with the intent to manufacture, distribute, deliver, or dispense a controlled substance under Neb. Rev. Stat. § 28-416(1)(a) (Reissue 2016) and one count of knowingly or intentionally possessing money used or intended to be used to facilitate a violation of § 28-416(1). On appeal, he alleges that the evidence obtained during a search of his home ought to have been suppressed and that the court violated his due process rights during sentencing. We affirm.

### BACKGROUND

On June 26, 2017, the Lincoln Police Department received a Crime Stoppers tip alleging that the welfare of a child who lived at a specific address on South 11th street was at risk. The tip also alleged that drugs from Colorado were being transported to the home and that drug

- 1 -

transactions took place while the child was present in the home. At approximately 12:30 p.m., two uniformed Lincoln Police Officers--Joseph Fisher and Christopher Weber--arrived at the residence in their marked squad cars to perform a welfare check.

Fisher knocked on the home's front door for approximately three minutes before Hall eventually answered. Fisher explained that they were there to check the welfare of the child who lived there and asked for permission to enter the home. Fisher testified that he asked Hall if he could enter in order to make sure that the child's basic needs were being fulfilled and explained his desire to verify that the home contained food, water, clothing, and proper shelter for the child. Fisher testified that he made no threats or promises to Hall, did not have his service weapon drawn, and did not tell Hall that he had to admit the officers. Fisher said that Hall did not attempt to close the door. Hall confirmed that a child lived in the home and said that she was at daycare at the time. Hall then allowed Fisher and Weber to enter the home, saying something like, "Come in."

When the officers entered Hall's home, they smelled marijuana. Fisher asked Hall about the odor, and Hall admitted that he smoked marijuana but said that he did not sell it. Hall also said that there was no marijuana in the home. There was another man in the home with Hall, and he "kind of hung out in the living room" while the officers walked through the home according to Weber.

Fisher described that the first room they entered was larger and split into two halves with a living area occupying one half and a dog kennel and toys occupying the other half. Fisher observed the home as they walked, looking for anything illegal or dangerous and saw nothing illegal. From the living area, Weber could see through an open door into what appeared to be the child's bedroom. He said he could see children's-type clothing in the room. Off the main living area was a dining room, which they walked through to access the kitchen. In the kitchen, Fisher saw some food items and dishes on the counter but said it was not excessive.

The officers next asked Hall to open the refrigerator so they could see what food was present. At that point, Fisher observed a box of 9-milimeter ammunition on top of the refrigerator. "Knowing that guns could be a safety risk to children," Fisher asked Hall whether there was a gun in the home, and Hall said that there was not. Next to the ammunition on top of the refrigerator and "in plain view" according to Fisher, was a blue glass pipe consistent with those used to smoke marijuana and a clear container that contained marijuana. Fisher testified that he did not have to move anything to observe the pipe and marijuana on top of the refrigerator. Fisher took possession of those items and told Hall that he would give him only a verbal warning for the pipe and small amount of marijuana because Hall was cooperating. At the same time, Weber observed numerous glass pipes of the type associated with smoking marijuana sitting above the kitchen sink.

Fisher then saw on top of the refrigerator a large white container that contained approximately 20 smaller jars with a graphic of marijuana leaves printed on them. Fisher testified that those jars were consistent with jars commonly used to store tetrahydrocannabinol (THC) wax. Some of the jars were clear, and Fisher saw that they contained a milky, waxy substance, which he believed to be THC wax based on his training and experience. Fisher acknowledged that he was unable to see the jars' contents until he "manipulate[ed] the 20 jars to see the clear ones."

Based on the items found, Fisher told Hall that they would seize the home while applying for a search warrant unless he consented to a search. Hall did not consent to a search of the home

and said that he preferred for the officer to obtain a warrant. Fisher testified that up until that point, Hall never told them to leave, said that they were unwelcome, or asked to speak to an attorney. The other man in the home never asked the officers to leave either. Hall and the other man left the home while Fisher went to apply for a search warrant.

Fisher authored an affidavit in support of his application for a search warrant, wherein he described his contact with Hall after receiving the Crime Stoppers tip. Fisher wrote that the tip alleged that Hall and his roommate rented vehicles under another person's name and drove to Colorado approximately every 7 to 10 days and distributed drugs from the home. The tip further alleged that Hall's 3-year-old daughter lived in the home and that she was in danger. In his affidavit, Fisher wrote that he met Hall "at the front door of the house and explained the need to check the welfare" of the child. Fisher testified that he did not specifically remember telling Hall that he "need[ed]" to check on the child but acknowledged that he used the word "need" in his affidavit. In his affidavit, Fisher wrote that he asked Hall if he could enter the home and check for basic necessities, which Hall allowed. Fisher also described observing a pipe, marijuana, and containers of suspected THC wax on top of Hall's refrigerator. Taken together, Fisher said that his observations constituted probable cause for the issuance of a search warrant for Hall's home and automobile. The county court for Lancaster County issued a search warrant for Hall's home and automobile.

While Fisher applied for a search warrant, Weber secured the home, pending its search. Weber stood in the home's entryway until another officer arrived to secure the rear of the home, and then he stepped outside, shutting the door behind him. No one entered the home until Fisher returned with the search warrant.

Fisher returned to Hall's home with the search warrant, which he turned over to the on-scene supervisor and the detective leading the Narcotics Task Force. The warrant was read to all parties conducting the search. An inventory of seized property shows that the search turned up, in relevant part, a total of eight bongs, a container of THC concentrate, three scales, baggies, three bags of marijuana, "numerous" containers of THC wax, three bags of U.S. currency, one bag of edibles, two iPhones, and a 9-millimeter handgun and ammunition. Fisher called Hall when the search was completed and advised Hall that he would be arrested based on the evidence seized. Although Hall did not agree to meet to accomplish the arrest, he was nevertheless later taken into custody.

Two days after the search, on June 28, 2017, Hall was charged under § 28-416(1)(a) with two counts of manufacturing, distributing, delivering, dispensing, or possessing with the intent to manufacture, distribute, deliver, or dispense a controlled substance. He was also charged under § 28-416(17) with one count of knowingly or intentionally possessing money used or intended to be used to facilitate a violation of § 28-416(1).

On February 21, 2018, Hall filed a motion to suppress tangible evidence and statements obtained following the officers' warrantless entry into his home. Hall alleged in his motion that Fisher and Weber entered his home without a search warrant and conducted a search without his consent. Hall further argued that the evidence seized from his home as a result of that initial warrantless search ought to be suppressed under the fruit of the poisonous tree doctrine.

A hearing on Hall's motion to suppress was held on March 28, 2018. The State offered testimony from both Fisher and Weber. Hall offered no evidence. At the close of the hearing, the court overruled Hall's motion to suppress. The court found the officers' testimony "credible in all respects." The court further found that Hall consented to Fisher and Weber's entrance into his home and that they observed narcotics, paraphernalia, and other controlled substances in plain view.

A stipulated bench trial was held on August 9, 2018. Hall renewed his motion to suppress and objected to the receipt of evidence on that ground. However, Hall stipulated that the officers, if called to testify, would testify in conformity with their testimony at the suppression hearing and the police reports they filed, which were admitted into evidence. On September 19, a hearing was held during which the court announced that it found Hall guilty beyond a reasonable doubt with respect to the three counts as charged. The court revoked Hall's bond, noting that he was facing a possible sentence of over 40 years, and ordered that a presentence investigation report (PSI) be completed prior to sentencing.

Sentencing was held on October 26, 2018. The court reviewed the PSI and added a letter from Hall and a character reference from Hall's employer. Both Hall and the State reviewed the PSI prior to sentencing and offered no additions or corrections. Hall argued that he should receive a sentence of probation because he was at "a crossroads" and was presently motivated to take care of his daughter--who was near the same age that Hall was when his mother left his life for a period of time. He also argued that he would forego future marijuana use. Hall did not exercise his right of allocution. The State did not comment on sentencing.

The court found that Hall was not an appropriate candidate for a sentence of probation. It called probation a "ludicrous request given the severity of the crimes" and the information contained in the PSI. Hall scored a 34 on the LS/CMI, which indicates that he is at very high risk to reoffend, and scored at high or very high risk to reoffend with respect to seven of the eight individual LS/CMI domains. In light of Hall's high risk of reoffending, the court found that a lesser sentence "would really just promote a disrespect for the law." The court continued, "You know, the rest of the community reads the paper and looks at what you were convicted of, and they would say 'Really, this guy was put on probation?'"

The court rejected Hall's arguments that insinuated his crime resulted from a troubled childhood or drug addiction. Instead, the court said:

> Sir, I see your situation not so much as you getting swept up in the circumstances of horrible childhood because certainly I've seen a lot worse. I also don't see this as being a situation where you had to continue to sell drugs to support a habit. I don't see really that you're an addict in what the sense of that word means.
>
> What I see this situation as being, frankly, is just really the cost of doing business. You knew. You had quite an operation going on. . . . Taking trips back and forth to Colorado in order to get the THC concentrate and then sell it--bring it back to our community and sell it to people, you know, obviously, who wanted to buy it, I guess.
>
> We just can't have that going on in our community without somebody suffering the consequences for it. And that's what I'm saying about the cost of doing business. You knew that by doing this, you might have the benefit of making a lot of money and being

able to live in a lifestyle that you had become accustomed to and support yourself and your family and your child.

But you also knew that if you got caught, you were probably going to do some time for it. And maybe that's why you fought so hard and up until your letter this morning, frankly, just blamed the police for giving you a hard time and possibly taking advantage of you and didn't even really think that you should have been hassled for all of this.

In consideration of the nature of the crime, Hall's history and character, and the necessity of protecting the public, the court held that a sentence of imprisonment was necessary. Accordingly, the court sentenced Hall to periods of 8 to 10 years' imprisonment for each of the two drug convictions and 2 to 2 years' imprisonment for the money conviction, all of which were ordered to be served concurrently with one another.

Hall appeals from his convictions and sentence.

## ASSIGNMENTS OF ERROR

Hall assigns that the district court erred in denying his motion to suppress all evidence obtained as a result of the search of his home and in certain commentary at sentencing, which he alleges violated his due process rights.

## STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Kruse*, 303 Neb. 799, 931 N.W.2d 148 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Kruse, supra*.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Russell*, 299 Neb. 483, 908 N.W.2d 669 (2018), *cert. denied* ___ U.S. ___, 139 S. Ct. 195, 202 L. Ed. 2d 121. A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id*.

## ANALYSIS

*Motion to Suppress.*

Hall challenges the validity of the consent he gave officers to search his home. He alleges that Fisher and Weber "coercively misrepresented the purpose of their search," which therefore invalidated his consent to their search. Brief for appellant at 14. Hall further alleges that the officers engaged in a surreptitious search for drug paraphernalia when they said that they "need[ed]" to check his child's welfare and promised to limit the search to confirm that his child's basic needs were being met. Because Hall contends that the search was performed without his valid consent, he argues that the search was prohibited under the Fourth Amendment and, therefore, all evidence obtained therefrom ought to have been suppressed. The State argues in reply that Hall freely and

voluntarily consented to the officers' search of his home and that the officers properly limited the scope of their search to the areas necessary to evaluating the child's welfare and other areas in plain view. Because the search was validly conducted pursuant to Hall's consent, the State contends that the evidence obtained therefrom was legally obtained. For the reasons that follow, we affirm the district court's order overruling Hall's motion to suppress.

Fisher and Weber did not have a search warrant when they initially entered Hall's home to perform a welfare check of the child pursuant to a Crime Stoppers tip. Warrantless searches and seizures are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions, which must be strictly confined by their justifications. *State v. Borst*, 281 Neb. 217, 795 N.W.2d 262 (2011). One well-recognized exception to the warrant requirement is a search undertaken with consent. *Id*.

To be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne. *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019). Consent must be given voluntarily and not as a result of duress or coercion, whether express, implied, physical, or psychological. *Id*. The determination of whether the facts and circumstances constitute a voluntary consent to a search, satisfying the Fourth Amendment, is a question of law. *State v. Schriner, supra*. Whether consent to a search was voluntary is to be determined from the totality of the circumstances surrounding the giving of consent. *Id*.

Based on the evidence from the suppression hearing in the present case, the court did not err in overruling Hall's motion to suppress. Fisher and Weber testified that they went to Hall's home after receiving a Crime Stoppers tip alleging that drug transactions took place in the home while a child was present. They arrived at Hall's home in uniform and knocked on his front door until he answered. At no point did they draw their service weapons or tell Hall that he had to let them inside. Fisher testified that he told Hall about the Crime Stoppers tip and said that they wanted to enter the home in order to verify that it contained food, water, and clothing for the child. According to Fisher, Hall then said something like, "Come in." There is no evidence in the record that indicates anything other than Hall voluntarily admitting the officers into his home.

Fisher and Weber observed their surroundings as they entered the home and followed Hall into the kitchen. In the kitchen, Hall opened the refrigerator so that the officers could see what food was inside. It was at that point that Fisher observed in plain view marijuana, suspected THC wax, and a marijuana pipe on top of the refrigerator and Weber observed in plain view multiple marijuana pipes near the sink. The officers were lawfully in positions to observe in plain view objects whose incriminating nature was immediately apparent. To that point, Hall had never asked the officers to leave. However, once the officers observed drugs and drug paraphernalia, they told Hall that they had probable cause to search the home and would apply for a search warrant unless Hall would allow them to search the home. Hall responded at that time that he would prefer that the officers obtain a search warrant.

Our record makes it clear that Hall voluntarily consented to the officers' entry into his home and their ensuing search up through the point that they found drugs and drug paraphernalia in his kitchen. It was only after the officers had already observed in plain view numerous pipes, marijuana, and THC wax that Hall indicated he would no longer consent to the officers' search.

This denial of consent demonstrates that Hall's will had not been overborne by the actions of the police. Because Fisher and Weber observed in plain view the evidence of Hall's crimes while conducting a search within the parameters of Hall's voluntary consent, we conclude that the district court did not err in overruling Hall's motion to suppress.

*Sentencing.*

Hall alleges that the district court violated his due process rights when it effectively imposed upon him "a 'sentencing tax' . . . for either filing Motions to Suppress or for arguing for a probation sentence." Brief for appellant at 22. He contends that the court's comments during sentencing reveal that his punishment was not based on proper considerations. The State argues in reply that the court acted properly during sentencing, considered appropriate sentencing factors, and did not deprive Hall of due process. We find no violation of due process in the manner in which the court sentenced Hall.

The Due Process Clause applies when government action deprives a person of liberty or property; accordingly, when there is a claimed denial of due process, a court must consider the nature of the individual's claimed interest. *State v. Arizola*, 295 Neb. 477, 890 N.W.2d 770 (2017). In the context of criminal proceedings, due process generally requires the defendant be given notice and an adequate opportunity to defend himself or herself. *Id*. Due process requires that sentencing judges consider only relevant information as the basis for a sentence. *State v. Cerritos-Valdez*, 295 Neb. 563, 889 N.W.2d 605 (2017). If a judge's comments during sentencing could cause a reasonable person to question the impartiality of the judge, then the defendant has been deprived of due process and the judge has abused his or her discretion. *State v. Pattno*, 254 Neb. 733, 579 N.W.2d 503 (1998).

When imposing a sentence, the sentencing court is to consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019). However, the sentencing court is not limited to any mathematically applied set of factors. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

In *State v. Manjikian, supra*, the appellant argued that the sentencing court improperly relied on baseless allegations that he was involved in organized crime when it sentenced him to a term of imprisonment rather than probation. On appeal, the Supreme Court acknowledged that the sentencing court was aware of unsubstantiated allegations of the appellant's involvement in organized crime but held that the sentence was not based solely on those allegations. *Id*. Instead, the sentencing court's comments demonstrated its reliance on the PSI's findings and an evaluation of the facts and circumstances surrounding the appellant's life and the crime charged. *Id*. Accordingly, the Court held that the appellant's argument regarding his sentence was without merit. *Id*.

As in *Manjikian*, the court's comments in the present case demonstrate its evaluation of appropriate sentencing factors and do not reveal the impropriety that Hall alleges. Hall extracts single words and short phrases from the sentencing hearing, some of which are blunt in nature, and presents them without context in his brief on appeal. When reviewed in the context of the full sentencing hearing, however, the court's comments that disturb Hall directly correspond to proper sentencing considerations.

Hall first takes issue with the court's discussion of him "blam[ing] the police" and him thinking he should not have been "hassled for all of this." These comments directly correspond to the court's consideration of whether Hall accepted responsibility for the crimes he committed. The PSI notes that Hall "did not appear to take responsibility for the present offense," which led to the PSI's determination that Hall was at high risk of reoffending based on his procriminal attitude/orientation. Hall next takes issue with the court's characterization of his request for probation as "ludicrous." This comment directly corresponds to the court's consideration of the severity of Hall's crimes, which carried a possible sentence of over 40 years. The comment also reflected the court's detailed determinations that a sentence of probation would promote a disrespect for the law and that Hall was not a good candidate for probation based on the PSI's finding that he was at very high risk of reoffending based on his total score of 34 on the LS/CMI. Hall's next issue lays with the court's characterization of his crime as "the cost of doing business," which corresponds to the court's explanation that Hall knowingly and willingly engaged in criminal conduct and that his conduct was not the result of a debilitating childhood or drug addiction. Finally, Hall takes issue with the court's mention that the "community reads the paper" and will see his sentence. While this comment, absent the totality of the court's comments, could be read to take into account impermissible considerations, we read the comment as corresponding to the court's evaluation of the severity of Hall's crime and its determination that a lesser sentence would promote disrespect for the law by the community at large.

Based on our review, the court's comments at sentencing did not contravene Hall's right to due process. The court commented on relevant sentencing considerations. Thus, we find no error in the sentence imposed or in the rationale of the court.

## CONCLUSION

The district court did not err in overruling Hall's motion to suppress evidence. Additionally, there was no violation of Hall's right to due process in the sentence imposed. Therefore, we affirm.

AFFIRMED.